UNITED STATES DISTRICT COURT

Northern District of California

San Francisco Division

| | |
|---|---|
| JESUS LOPEZ, for himself and as the Guardian ad Litem for EDGAR LOPEZ, ALEXANDRA LOPEZ, and GRETSANDY LOPEZ, his minor children,<br><br>          Plaintiff,<br>     v.<br><br>CONTRA COSTA REGIONAL MEDICAL CENTER and COUNTY OF CONTRA COSTA<br><br>          Defendants.<br>_____/ | No. C 12-03726 LB<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT** |

## INTRODUCTION

Plaintiff Jesus Lopez in his individual capacity, and as the Guardian ad Litem for his three minor children Edgar, Alexandra, and Gretsandy Lopez, is suing Defendants Contra Costa Regional Medical Center and County of Contra Costa (together, "CCRMC") for medical malpractice and for violating the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, following the death of Mr. Lopez's wife from complications after she gave birth at Contra Costa Regional Medical Center. The court grants the motion to dismiss.

## STATEMENT

The complaint states two claims: a violation of EMTALA and a state claim for medical negligence. The complaint's allegations are summarized in the next sections.

## I. EMTALA CLAIM

Plaintiff Jesus Lopez is the surviving spouse of Sandra Lopez, and Edgar, Alexandra, and Gretsandy Lopez are their children. First Amended Complaint ("FAC"), ECF No. 15, ¶¶ 2-3.[1] On September 29, 2011, at around 11:05 p.m., Sandra Lopez "went to the [CCMRC] labor and delivery department in active labor." *Id.* ¶ 3. Thirty minutes later, lab results showed that Mrs. Lopez was suffering from HELLP syndrome.[2] *Id.* ¶ 4. Approximately ten minutes later, Mrs. Lopez gave birth to Gretsandy Lopez. *Id.* Shortly thereafter, the delivering physician learned that Mrs. Lopez was suffering from HELLP syndrome. *Id.* Because they knew that HELLP syndrome can be fatal if not properly treated in an intensive care unit ("ICU"), CCRMC ordered Mrs. Lopez to be moved to the CCMRC ICU. *Id.* ¶ 5.

Two and a half hours after the delivery and the detection of the HELLP syndrome (which makes it approximately 2:15 a.m. on September 30, 2011), Mrs. Lopez was not "transferred" to the ICU because a bed was not available. *Id.* ¶ 6. Instead, she was "transferred" from the labor and delivery department to CCRMC room 5CP16 for postpartum care and not to stabilize her HELLP syndrome. *Id.* When the "transfer" occurred, the defendants knew that (a) Mrs. Lopez was suffering from life-threatening emergency medical conditions caused by HELLP syndrome which required stabilization in CCRMC's ICU or another nearby ICU and (b) the emergency medical conditions had not been stabilized within the meaning of 42 U.S.C. § 3955dd and 42 C.F.R. § 4889.24 in that the defendants did not, within the capabilities of the staff and facilities available at CCRMC, provide for further medical examination and treatment as required to stabilize the emergency medical conditions. *Id.* Treatment to stabilize the HELLP syndrome was not provided. *Id.* The defendants knew that the emergency medical conditions could not be stabilized without admission to an ICU, and no attempt was made to transfer Mrs. Lopez after it was determined that a bed was not available in the CCRMC ICU. *Id.* ¶ 7. Under 42 U.S.C. § 3955dd and 42 C.F.R. § 489.24, the defendants were required to

---

[1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-generated page numbers at the top of the document.

[2] HELLP stands for hemolysis, elevated liver enzyme, and low platelet count. *Id.* ¶ 4.

ORDER ( C 12-03726 LB)                                    2

1  stabilize the medical conditions associated with HELLP or transfer Mrs. Lopez to another hospital,
2  and they did not. *Id.* ¶ 8. Because she was not transferred to another ICU and her emergency
3  medical conditions were not stabilized, Mrs. Lopez died. *Id.* ¶ 9.

## II. MEDICAL NEGLIGENCE CLAIM

The medical negligence section of the complaint incorporates the complaint's first five paragraphs (the information in the first paragraph of the last section) by reference. *Id.* ¶ 11. It then alleges the following. Defendants failed to provide the care and treatment required by the standard of care for the treatment of pre-eclampsia, eclampsia, and the HELPP syndrome. *See id.* ¶ 13. Also, they did not advise Mrs. Lopez and Mr. Lopez that she had been diagnosed with pre-eclampsia when she previously delivered her second child, and they failed to monitor her pregnancy for pre-eclampsia, all in violation of the standard of care. *Id.*

## III. PROCEDURAL HISTORY

Mr. Lopez filed his lawsuit in this court on July 16, 2012, alleging EMTALA and medical malpractice claims. *See* Compl., ECF No. 1. On July 25, 2012, the court appointed Mr. Lopez the guardian ad litem for his three minor children. *See* Order, ECF No. 7. On October 10, 2012, the court granted Defendants' motion to dismiss the complaint with leave to amend on the ground that Mr. Lopez failed to state an EMTALA claim. *See* ECF Nos. 8, 14. Mr. Lopez filed the FAC on November 5, 2012, again alleging EMTALA and medical malpractice claims. *See* FAC, ECF No. 15. He seeks damages of $5,000,000 for the EMTALA violation and $750,000 for medical malpractice. *Id.* ¶¶ 10, 14, and Prayer for Relief. Defendants filed a motion to dismiss Plaintiff's complaint on November 15, 2012. *See* ECF No. 16. The court held a hearing on January 3, 2013.

## DISCUSSION

CCRMC argues that Plaintiff fails to state a claim because EMTALA does not apply to a patient – such as Mrs. Lopez – who is admitted for care. Motion, ECF No. 8 at 4-6. It then argues that the court should not assert supplemental jurisdiction over Plaintiffs' state malpractice claim. *Id.*

## I. STANDARDS

### A. Motion to Dismiss

A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) when it does

UNITED STATES DISTRICT COURT
For the Northern District of California

not contain enough facts to state a claim to relief that is plausible on its face. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations and parenthetical omitted).

In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *See id.* at 550; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007).

If the court dismisses the complaint, it should grant leave to amend even if no request to amend is made "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir.1990)).

**B. EMTALA**

Congress passed EMTALA, also known as the "Patient Anti-Dumping Act," to prohibit hospital emergency rooms from refusing to treat indigent and uninsured patients or transferring patients to other hospitals without first stabilizing their condition. *See Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1254 (9th Cir. 2001). When a individual requests treatment in a hospital emergency department, EMTALA requires the hospital to "provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including available ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition [as defined in the statute] exists." 42 U.S.C. § 1395dd(a).

An "emergency medical condition" is defined in section 1395dd(e)(1) as follows:

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in –

    (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

    (ii) serious impairment to bodily functions, or

    (iii) serious dysfunction of any bodily organ or part; or

(B) with respect to a pregnant woman who is having contractions–

    (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or

    (ii) that the transfer may pose a threat to the health or safety of the woman or unborn child.

If the hospital determines that the individual has an emergency medical condition, the hospital must "provide either –

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize[3] the medical condition, or

(B) for transfer[4] of the individual patient to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(b)(1). Subsection (c) is titled "Restricting transfers until individual is stabilized," and it sets forth the conditions that must be met before a hospital may transfer an unstabilized patient:

---

[3] Under section 1395dd(e)(3)(A), "[t]he term 'to stabilize' means, with respect to an emergency medical condition described in paragraph [1395dd(e)](1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of an individual from a facility, or, with respect to an emergency medical condition described in paragraph [1395dd(e)](1)(B), to deliver, including the placenta."

[4] EMTALA defines "transfer" as "the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by . . . the hospital . . . ." 42 U.S.C. § 1395dd(e)(4). The definition of "transfer" in 42 C.F.R. § 489.24(b) tracks the statute.

(1) Rule

If an individual at a hospital has an emergency medical condition which has not been stabilized[5] (within the meaning of subsection (e)(3)(b) of this section), the hospital may not transfer the individual unless –

    (A)(i) the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility;

    (ii) a physician . . . has signed a certification that based on the information available at the time of the transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual, and in the case of labor, to the unborn child from effecting the transfer;[6] or

    (iii) if a physician is not present in the emergency department at the time the individual is transferred, a qualified medical person . . . . has signed a certification [as described in section ii] . . . after a physician . . . , in consultation with the [qualified medical] person, has made the determination [described in section ii] . . . and subsequently countersigns the certification; and

    (B) the transfer is an appropriate transfer . . . .

42 U.S.C. § 1395dd(c)(1). An "appropriate transfer to a medical facility is a transfer –

    (A) in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

    (B) in which the receiving facility –

        (i) has available space and qualified personnel for the treatment of the individual; and

        (ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment;

    (C) in which the transferring hospital sends to the receiving hospital all medical records . . . relating to the emergency condition [including records of the medical condition, observations of signs or symptoms, diagnosis, and test results] . . . and the informed written consent . . . ;

    (D) in which the transfer is effected through qualified personnel and transportation equipment [including the use of life support measures during the transfer] . . . ; and

---

[5] Under section 1395dd(e)(3)(B), "[t]he term 'stabilized' means, with respect to a medical emergency described in paragraph [1395dd(e)](1)(A), that no material deterioration of the medical condition is likely, within reasonable medical certainty, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph [1395dd(e)](1)(B), that the woman has delivered (including the placenta)."

[6] The certification must include a summary of the risks and benefits upon which the certification is based. 42 U.S.C. § 1395dd(c)(1)(B).

ORDER ( C 12-03726  LB)   6

(E) which meets other such requirements as the Secretary may find necessary in the health and safety of individuals transferred.

42 U.S.C. § 1395dd(c)(2).

In 2003, the Centers for Medicare & Medicaid Services of the Department of Health and Human Services promulgated regulations interpreting key EMTALA provisions. *See* 42 C.F.R. § 489.24 (2012) (the "CMS Regulations"). 42 C.F.R. § 489.24(a) provides that EMTALA does not apply to patients who have been admitted for treatment:

(1) [I]f an individual . . . "comes to an emergency department"[7], as defined in paragraph [489.24](b) of this section, the hospital must –

(i) Provide an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition exists. The examination must be conducted by an individual(s) . . . qualified under hospital bylaws or rules and regulations and [under 42 C.F.R. § 482.55]; . . . and

(ii) If an emergency medical condition is determined to exist, provide any necessary stabilizing treatment, as defined in paragraph (d) of this section, or an appropriate transfer as defined in paragraph (e) of this section. **If the hospital admits the individual as an inpatient for further treatment, the hospital's obligation under this section ends, as specified in paragraph (d)(2) of this section.**

42 C.F.R. § 489.24(a) (emphasis added). Section 489.24(d) reiterates:

(d) Necessary stabilizing treatment for emergency medical conditions –

(1) General. Subject to the provisions of paragraph (d)(2) of this section, if any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either –

(i) Within the capabilities of the staff and facilities available at the hospital, for further

---

[7] "Comes to the emergency department" is defined in section 489.24(b), which states that it "means, with respect to an individual **who is not a patient** (as defined in this section), the individual" has presented at the emergency department and requests treatment for a medical condition, has presented on hospital property and requests treatment for what may be an emergency medical treatment, or is in an ambulance for purposes of treatment in the hospital's emergency department (under certain conditions). 42 C.F.R. § 489.24(b) (emphasis added). "Patient" is defined as a person who has begun to receive outside patient services (under certain circumstances) or an individual who has been admitted as an inpatient. *Id.*

medical examination and treatment as required to stabilize[8] the medical condition.

(ii) For transfer of the individual to another medical facility in accordance with paragraph (e) of this section.

(2) Exception: Application to inpatients.

(i) If a hospital has screened an individual under paragraph (a) of this section and found the individual to have an emergency medical condition, **and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition**, the hospital has satisfied its special responsibilities under this section with respect to that individual.

42 C.F.R. § 489.24(d) (emphasis added). The CMS Regulations also define the term "inpatient:"

Inpatient means an individual who is admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services as described in § 409.10(a) of this chapter with the expectation that he or she will remain at least overnight and occupy a bed even though the situation later develops that the individual can be discharged or transferred to another hospital and does not actually use a hospital bed overnight.

42 C.F.R. § 489.24(b). Section 409.10(a) defines "inpatient hospital services" as a series of services:

(1) Bed and board.

(2) Nursing services and other related services.

(3) Use of hospital and CAH [Critical Access Hospital] facilities.

(4) Medical social services.

(5) Drugs, biologicals, supplies, appliances, and equipment.

(6) Certain other diagnostic or therapeutic services.

(7) Medical or surgical services provided by certain interns or residents-in-training.

(8) Transportation services, including transport by ambulance.

42 C.F.R. § 409.10(a).[9]

## II. THE EMTALA CLAIM

---

[8] 42 C.F.R. § 489.24(b)'s definition of "to stabilize" is the same as the definition in 42 U.S.C. § 1395dd(e)(e)(A), meaning, to provide such treatment to assure that no material deterioration is likely to result from or occur during transfer. *See supra* n.3.

[9] 42 C.F.R. § 409.10(b) excludes services that are not relevant here from the definition of inpatient hospital services.

ORDER ( C 12-03726 LB)                                    8

CCRMC argues that Mr. Lopez's EMTALA claim fails because (1) the allegations establish that Mrs. Lopez was admitted to CCRMC, which precludes EMTALA liability, and (2) EMTALA's stabilization requirements do not apply because CCRMC did not transfer Mrs. Lopez. Motion, ECF No. 16 at 6-11. Mr. Lopez responds that whether Mrs. Lopez's treatment in labor and delivery and whether her transfer to the post-partum floor were inpatient admissions are issues of fact that preclude dismissal at the Rule 12(b)(6) stage. Opposition, ECF No. 17 at 3. Alternatively, he asserts that if transfer to the post-partum floor was an inpatient admission, it still is a fact question whether that admission was in good faith such that it precludes EMTALA liability. *Id.* at 3-4. Finally, he asserts that he ought to get fact discovery on this factual issue. *Id.* at 5-6.

The EMTALA statutes and CMS regulations have several requirements that are relevant here. First, when an individual such as Mrs. Lopez "comes to a hospital emergency department" and requests treatment for an emergency medical condition, the hospital must "provide an appropriate medical screening examination within the capability of the hospital's emergency department." 42 U.S.C. § 1395dd(a); 42 C.F.R. § 489.24(a)(1). Second, if the hospital detects an emergency medical condition and does not admit the individual, then it must provide either (a) "within the staff and facilities available at the hospital for such further medical examination and such treatment as may be required to stabilize the medical condition," meaning, the treatment to assure with reasonable medical probability that no material deterioration will happen during a transfer, or (b) for transfer to another medical facility under one of the exceptions described in section 1395dd(c) (set forth above on page 6). *See* 42 U.S.C. § 1395dd(b)(1); 42 U.S.C. § 1395dd(b)(1); 42 C.F.R. §§ 489.24(a), (b) and (d). Third, if the hospital performs the screening of the emergency medical treatment and admits the individual as an inpatient either for further treatment or in good faith in order to stabilize[10] the emergency medical condition, then the hospital has satisfied its responsibilities with respect to the individual. *See* 42 C.F.R. §§ 489.24(a)(1)(ii) and (d)(2)(ii); *Bryant v. Adventist Health Systems/West*, 289 F.3d 1162, 1170 (9th Cir. 2002) ("EMTALA generally ceases to apply once a

---

[10] Again, "to stabilize" means essentially to provide such treatment to assure that no material deterioration is likely to result from or occur during transfer. *See* 42 U.S.C. § 1395dd(e)(e)(A): 42 C.F.R. § 489.24(b); *supra* n.3.

ORDER ( C 12-03726  LB)    9

hospital admits an individual for inpatient care . . . .").

The first issue is whether – after it screened and determined that there was an emergency medical condition – CCRMC admitted Mrs. Lopez as an inpatient either for further treatment or in good faith to stabilize the emergency medical condition. *See* 42 C.F.R. §§ 489.24(a)(1)(ii) and (d)(2)(ii).

As to whether Mrs. Lopez was admitted as inpatient, the definition of inpatient in 42 C.F.R. § 289.24(b) and 42 C.F.R. § 409.10(a) – an individual who is admitted to bed occupancy who is expected to remain overnight and receive inpatient services that include bed and board, nursing services, use of hospital facilities, drugs, diagnostic or therapeutic services, and medical or surgical services – may suggest that her arrival at the labor and delivery department was an admission, but the court cannot conclude it as a matter of law. *See supra* at 8 (setting forth the definition in full). The allegations in the complaint are that Mrs. Lopez arrived at CCRMC's labor and delivery department in active labor, CCRMC gave her diagnostic tests that revealed the HELLP syndrome 30 minutes later, Mrs. Lopez delivered her baby 10 minutes later, the delivering physician learned shortly thereafter about the HELLP syndrome, and – because HELLP can be fatal if not treated – CCRMC ordered Mrs. Lopez moved to the ICU. FAC, ECF No. 15, ¶¶ 3-5.

The issue is closer with the move two and a half hours after delivery of Mrs. Lopez to CCRMC room 5CP16 for post-partum care. *Id.* ¶ 6. The allegations are that despite the ICU order, she was not "transferred" there because a bed was not available. *Id.* Instead, she was "transferred" from labor and delivery to room 5CP16 for post-partum care and not to stabilize her HELLP syndrome. *Id.* Hospital officials knew it was an emergency condition that required treatment. *Id.*

Plaintiff says in his opposition that "[w]hen a person goes to the emergency department and is thereafter transferred to a hospital bed, the inpatient admission to the hospital occurs at that time"a. *Id.* at 6. He also says that "bed occupancy occurred approximately 2 ½ hours after delivery and the discovery of the HELLP syndrome." *Id.* at 3. At the January 3 hearing, the court asked Plaintiff directly whether being given a bed and post-partum services constituted inpatient admission, and Plaintiff reiterated that it was a question of fact. On this record, and considering the allegations in the complaint about arrival, diagnostic tests, delivery, diagnosis, and orders to admit first to the ICU and then for post-partum care, the court concludes that the hospital admitted Mrs. Lopez.

ORDER ( C 12-03726  LB)        10

1   The court nonetheless addresses both possible situations: admission and non-admission.

2   Assuming (as the court has held) that the hospital admitted Mrs. Lopez, the hospital's obligations under EMTALA ended if the hospital admitted Mrs. Lopez either (1) as an inpatient for further treatment, or (2) if it admitted her in good faith in order to stabilize[11] the emergency medical condition. *See* 42 C.F.R. §§ 489.24(a)(1)(ii) and (d)(2)(ii). EMTALA does not set forth the guidelines for the care and treatment of patients who – like Mrs. Lopez – are admitted and who are not transferred. *See Harry v. Marchant*, 291 F.3d 767, 771 (11th Cir. 2012). Put another way, it does not establish a federal malpractice claim or a federal standard of care. *See Bryant v. Adventist Health Systems/West*, 289 F.3d 1162, 1169 (9th Cir. 2002).

The issue as framed by Plaintiff is that the hospital did not admit her in good faith in order to stabilize the emergency medical condition. But no allegations establish that lack of good faith in admitting her. The allegations in the complaint are that the hospital knew that she was suffering from a life-threatening emergency medical condition, knew by roughly 11:35 p.m. (one-half hour after arrival) that she was suffering from HELLP, and – ten-plus minutes later right after delivery when the delivering physician found out about the HELLP syndrome – referred her to the ICU. Complaint, ¶ 6. Two and a half hours after the delivery, the hospital did not transfer her to the ICU and instead sent her to Room 5CP16 for post-partum care and not to address the HELLP syndrome (e.g., not for further treatment of the emergency medical condition). *Id.* The hospital did not provide treatment to stabilize the HELLP syndrome, and the hospital knew that the HELLP syndrome could not be stabilized without admission to the ICU. *Id.* As a result, Mrs. Lopez died. This may be a violation of the standard of care but it does not establish a lack of good faith in admitting her.

Nothing in the complaint suggests any lack of good faith. For example, a ruse admission might allow an EMTALA claim:

[A] hospital cannot escape liability under EMTALA by ostensibly 'admitting' a patient, with

---

[11] Again, "to stabilize" means essentially to provide such treatment to assure that no material deterioration is likely to result from or occur during transfer. *See* 42 U.S.C. § 1395dd(e)(e)(A): 42 C.F.R. § 489.24(b); *supra* n.3.

ORDER ( C 12-03726 LB)   11

1  no intention of treating the patient, and then discharging or transferring the patient without
2  having met the stabilization requirement. In general, however, a hospital admits a patient to
   provide inpatient care. We will not assume that hospitals use the admission process as a
3  subterfuge to circumvent the stabilization requirement of EMTALA. If a patient
   demonstrates in a particular case that inpatient admission was a ruse to avoid EMTALA's
4  requirements, then liability under EMTALA may attach.

*Bryant*, 289 F.3d at 1169 (citing 42 U.S.C. §§ 1395dd(b)(1), 1395dd(e)(3)(A). *Bryant* and *Harry v. Marchant* both predate the EMTALA regulations. But the analysis is the same: negligence is not enough.

Plaintiff argued at the hearing that "patient keeping" is the same as "patient dumping" in that it is as bad to keep patients without treating them as it is to discharge them. But under EMTALA, a hospital's obligations end when it admits a patient for treatment, and a hospital satisfies its special responsibilities under EMTALA if it admits a patient in good faith in order to stabilize the emergency medical condition. Plaintiff's proposed rule – that admitting a patient, knowledge of the need for treatment, knowledge of how to treat, providing some care, and not providing the right care to address the emergency medical condition – is a violation of EMTALA would mean that every negligence claim is an EMTALA claim. That is not what EMTALA protects. It protects patients from a hospital's refusal to treat them or a transfer without stabilization.

That leads to the second scenario, which is whether – assuming that the hospital did not admit Mrs. Lopez – the outcome would change. Without admission, Plaintiff's "dumping" argument is plausible: it cannot be that the difference between (for example) leaving a patient unattended and turning them away alters liability under EMTALA. But when, as here, a patient is admitted as an inpatient, given a bed, and given care, a patient is not dumped. Any challenges to the standard of care – absent the good-faith exception already discussed – are claims of negligence, not an EMTALA violation.

Plaintiff's final argument is that the cases finding no liability under EMTALA generally are at the summary judgment stage. The court appreciates that point but as pleaded now, the court concludes that Plaintiff fails to state an EMTALA claim.

### III. SUPPLEMENTAL JURISDICTION

Having dismissed Plaintiff's EMTALA claim, the court must decide whether to retain

jurisdiction over Plaintiff's state law medical malpractice claim. In any civil action of which the district court has original jurisdiction, the district court shall have supplemental jurisdiction over related state law claims that are part of the same case or controversy. 28 U.S.C. § 1367(a). A district court may decline to exercise supplemental jurisdiction over a related claim grounded in state law where "(1) the claim raises a novel or complex issue of state law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." *Id.* at § 1367(c). The court may also decline to exercise supplemental jurisdiction if the retention of the state claims "requires the expenditure of substantial additional judicial time and effort." *Executive Software North America, Inc. v. U.S. Dist. Court for Cent. Dist. of California*, 24 F.3d 1545, 1548 (9th Cir. 1994); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343 (1988); *see also Government Employees Ins. Co. v. Dizol* 133 F.3d 1220, 1224 (9th Cir. 1998).

In the order dismissing Mr. Lopez's original complaint, the court declined to exercise supplemental jurisdiction over the state law medical malpractice claim. *See* Order, ECF No. 14 at 9-10. Plaintiffs do not renew the arguments the court previously rejected and do not suggest any other reason why the court should retain the medical malpractice claim. The litigation does not present anything exceptional or compelling under 28 U.S.C. § 1367(c)(4). Accordingly, the court declines to exercise supplemental jurisdiction over Plaintiff's state law medical malpractice claim.

## CONCLUSION

The court grants the motion to dismiss. The question is whether it should be with or without prejudice, given that the court already gave one opportunity to amend. Under the circumstances, given that the outcome here hinges on whether the transfer for post-partum care was an inpatient admission, the court gives another opportunity to amend. Again, the court's view is that the allegation of transferring to a bed for post-partum care is different than an allegation that a patient is "dumped" within the walls of the hospital. Still, Plaintiff has 21 days to file an amended complaint.

This disposes of ECF No. 16.

**IT IS SO ORDERED.**

Dated: January 8, 2012

_____
LAUREL BEELER
United States Magistrate Judge