UNITED STATES DISTRICT COURT

Northern District of California

San Francisco Division

| | |
|---|---|
| JESUS LOPEZ, for himself and as the Guardian ad Litem for EDGAR LOPEZ, ALEXANDRA LOPEZ, and GRETSANDY LOPEZ, his minor children,<br><br>Plaintiff,<br><br>v.<br><br>CONTRA COSTA REGIONAL MEDICAL CENTER and COUNTY OF CONTRA COSTA<br><br>Defendants.<br>_____/ | No. C 12-03726 LB<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>[ECF No. 22] |

### INTRODUCTION

Plaintiff Jesus Lopez in his individual capacity, and as the Guardian ad Litem for his three minor children Edgar, Alexandra, and Gretsandy Lopez, is suing Defendants Contra Costa Regional Medical Center and County of Contra Costa (together, "CCRMC") for medical malpractice and for violating the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, following the death of Mr. Lopez's wife from complications after she gave birth at Contra Costa Regional Medical Center. The court denies the motion to dismiss.

### STATEMENT

The Second Amended Complaint ("SAC") has two claims: a violation of EMTALA and medical negligence. The complaint's allegations are summarized in the next sections.

## I. ALLEGATIONS ABOUT THE EMTALA CLAIM

Plaintiff Jesus Lopez is the surviving spouse of Sandra Lopez, and Edgar, Alexandra, and Gretsandy Lopez are their children. SAC, ECF No. 21, ¶¶ 2-3.[1] On September 29, 2011, at around 11:05 p.m., Sandra Lopez "went to the [CCMRC] labor and delivery department in active labor." *Id.* ¶ 3. Thirty minutes later, CCRMC staff knew that Mrs. Lopez was suffering from an emergency medical condition (as defined by EMTALA) known as HELLP syndrome.[2] *Id.* ¶ 4. Approximately ten minutes later, Mrs. Lopez gave birth to Gretsandy Lopez. *Id.* Shortly thereafter, the delivering physician was informed that Mrs. Lopez was suffering from HELLP syndrome. *Id.* Two and a half hours after the delivery and the detection of the HELLP syndrome (which makes it approximately 2:15 a.m. on September 30, 2011), Mrs. Lopez was admitted to CCRMC's postpartum floor. *Id.*

This admission was "not made in good faith in order to stabilize Sandra Lopez'[s] emergency medical condition." *Id.* ¶ 5. Prior to and at the time of the admission to the post-partum floor, CCRMC knew that it did not have the staff and facility to stabilize Mrs. Lopez's emergency medical condition. *Id.* CCRMC knew it could not stabilize Mrs. Lopez's emergency medical condition so long as she was an inpatient at CCRMC. *Id.* The hospital admission was a substantial factor in causing Mrs. Lopez's death. *Id.* ¶ 6. Mr. Lopez and his children claim damages in excess of $5,000,000. *Id.* ¶ 7.

## II. ALLEGATIONS REGARDING MEDICAL NEGLIGENCE CLAIM

The medical negligence section of the complaint incorporates the SAC's first seven paragraphs (the information in the last section) by reference. *Id.* ¶ 8. It then alleges the following. Defendants, or its agents, employed physicians, nurses, and other staff who provided care, treatment, and other services to Mrs. Lopez, and their negligent acts were performed in the course and scope of their employment with CCRMC. *Id.* ¶ 9. CCRMC and the physicians, nurses, and staff failed to provide the care and treatment required by the standard of care for the treatment of pre-eclampsia, eclampsia,

---

[1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-generated page numbers at the top of the document.

[2] HELLP stands for hemolysis, elevated liver enzyme, and low platelet count. *Id.* ¶ 4.

and the HELPP syndrome. *Id.* ¶ 10. Also, they did not advise Mrs. Lopez and Mr. Lopez that she had been diagnosed with pre-eclampsia when she previously delivered her second child, and they failed to monitor her pregnancy for pre-eclampsia, all in violation of the standard of care. *Id.* As a result of these breaches of the standard of care, Mr. Lopez and his children claim damages in excess of $750,000. *Id.*

## III. PROCEDURAL HISTORY

Mr. Lopez filed his lawsuit suit on July 16, 2012, alleging EMTALA and medical malpractice claims. *See* Compl., ECF No. 1. On July 25, 2012, the court appointed Mr. Lopez the guardian ad litem for his three minor children. *See* Order, ECF No. 7. On October 10, 2012, the court granted Defendants' motion to dismiss the complaint with leave to amend on the ground that Mr. Lopez failed to state an EMTALA claim. *See* ECF Nos. 8, 14. Mr. Lopez filed a First Amended Complaint ("FAC") on November 5, 2012, again alleging EMTALA and medical malpractice claims. *See* FAC, ECF No. 15. On January 8, 2013, the court granted Defendants' motion to dismiss the complaint with leave to amend, again on the ground that Mr. Lopez failed to state an EMTALA claim. *See* Order, ECF No. 20. Mr. Lopez filed the SAC on January 29, 2013. SAC, ECF No. 21. Defendants filed the pending motion to dismiss on February 11, 2013. Motion, ECF No. 22. The court held a hearing on April 4, 2013.

## ANALYSIS

CCRMC argues that Plaintiffs fail to state a claim because EMTALA does not apply to a patient – such as Mrs. Lopez – who is admitted for care and that it cannot be liable under EMTALA for failing to stabilize Mrs. Lopez because it did not transfer her. *Id.* at 6-10. It then argues that the court should not assert supplemental jurisdiction over Plaintiffs' state malpractice claim. *Id.*

## I. STANDARDS

### A. Motion to Dismiss

A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) when it does not contain enough facts to state a claim to relief that is plausible on its face. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiffpleads factual content that allows the court to draw the reasonable inference that the defendant is liable for

ORDER ( C 12-03726 LB)  3

1 the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is
2 not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant
3 has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "While a complaint attacked by a
4 Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to
5 provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a
6 formulaic recitation of the elements of a cause of action will not do. Factual allegations must be
7 enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal
8 citations and parenthetical omitted). In considering a motion to dismiss, a court must accept all of
9 the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *See*
10 *id.* at 550; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles County*, 487 F.3d
11 1246, 1249 (9th Cir. 2007).

**B. EMTALA**[3]

Congress passed EMTALA, also known as the "Patient Anti-Dumping Act," to prohibit hospital emergency rooms from refusing to treat indigent and uninsured patients or transferring patients to other hospitals without first stabilizing their condition. *See Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1254 (9th Cir. 2001). When a individual requests treatment in a hospital emergency department, EMTALA requires the hospital to "provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including available ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition [as defined in the statute] exists." 42 U.S.C. § 1395dd(a).

An "emergency medical condition" is defined in section 1395dd(e)(1) as follows:

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in –

   (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

   (ii) serious impairment to bodily functions, or

---

[3] The court excerpted the statutes and regulations in the last order, but because EMTALA is very specific about a hospital's obligations, they are excerpted again.

ORDER ( C 12-03726 LB)    4

        (iii) serious dysfunction of any bodily organ or part; or

(B) with respect to a pregnant woman who is having contractions–

        (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or

        (ii) that the transfer may pose a threat to the health or safety of the woman or unborn child.

If the hospital determines that the individual has an emergency medical condition, the hospital must "provide either –

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer[4] of the individual patient to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(b)(1). "The term 'to stabilize' means, with respect to an emergency medical condition described in paragraph [1395dd(e)](1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of an individual from a facility, or, with respect to an emergency medical condition described in paragraph [1395dd(e)](1)(B), to deliver, including the placenta." *Id.* § 1395dd(e)(3)(A).

Subsection (c) is titled "Restricting transfers until individual is stabilized," and it sets forth the conditions that must be met before a hospital may transfer an unstabilized patient:

(1) Rule

If an individual at a hospital has an emergency medical condition which has not been stabilized[5] (within the meaning of subsection (e)(3)(b) of this section), the hospital may not transfer the individual unless –

    (A)(i) the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility;

    (ii) a physician . . . has signed a certification that based on the information available at the

---

    [4] EMTALA defines "transfer" as "the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by . . . the hospital . . . ." 42 U.S.C. § 1395dd(e)(4). The definition of "transfer" in 42 C.F.R. § 489.24(b) tracks the statute.

    [5] The term "stabilized" is consistent "to stabilize," meaning, no material deterioration of the medical emergency is likely to occur during transfer. *See* 42 U.S.C. §§ 1395dd(e)(3)(A) & (B).

ORDER ( C 12-03726 LB)       5

time of the transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual, and in the case of labor, to the unborn child from effecting the transfer;[6] or

(iii) if a physician is not present in the emergency department at the time the individual is transferred, a qualified medical person . . . . has signed a certification [as described in section ii] . . . after a physician . . . , in consultation with the [qualified medical] person, has made the determination [described in section ii] . . . and subsequently countersigns the certification; and

(B) the transfer is an appropriate transfer . . . .

42 U.S.C. § 1395dd(c)(1). An "appropriate transfer to a medical facility is a transfer –

(A) in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

(B) in which the receiving facility –

(i) has available space and qualified personnel for the treatment of the individual; and

(ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment;

(c) in which the transferring hospital sends to the receiving hospital all medical records . . . relating to the emergency condition [including records of the medical condition, observations of signs or symptoms, diagnosis, and test results] . . . and the informed written consent . . .;

(D) in which the transfer is effected through qualified personnel and transportation equipment [including the use of life support measures during the transfer] . . . ; and

(E) which meets other such requirements as the Secretary may find necessary in the health and safety of individuals transferred.

42 U.S.C. § 1395dd(c)(2).

In 2003, the Centers for Medicare & Medicaid Services of the Department of Health and Human Services promulgated regulations interpreting key EMTALA provisions. *See* 42 C.F.R. § 489.24 (2012) (the "CMS Regulations"). 42 C.F.R. § 489.24(a) provides that EMTALA does not apply to patients who have been admitted for treatment:

---

[6] The certification must include a summary of the risks and benefits upon which the certification is based. 42 U.S.C. § 1395dd(c)(1)(B).

(1) [I]f an individual . . . "comes to an emergency department"[7], as defined in paragraph [489.24](b) of this section, the hospital must –

(i) Provide an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition exists. The examination must be conducted by an individual(s) . . . qualified under hospital bylaws or rules and regulations and [under 42 C.F.R. § 482.55]; . . . and

(ii) If an emergency medical condition is determined to exist, provide any necessary stabilizing treatment, as defined in paragraph (d) of this section, or an appropriate transfer as defined in paragraph (e) of this section. **If the hospital admits the individual as an inpatient for further treatment, the hospital's obligation under this section ends, as specified in paragraph (d)(2) of this section.**

42 C.F.R. § 489.24(a) (emphasis added). Section 489.24(d) reiterates:

(d) Necessary stabilizing treatment for emergency medical conditions –

(1) General. Subject to the provisions of paragraph (d)(2) of this section, if any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either –

(i) Within the capabilities of the staff and facilities available at the hospital, for further medical examination and treatment as required to stabilize[8] the medical condition.

(ii) For transfer of the individual to another medical facility in accordance with paragraph (e) of this section.

(2) Exception: Application to inpatients.

(i) If a hospital has screened an individual under paragraph (a) of this section and found the

---

[7] "Comes to the emergency department" is defined in section 489.24(b), which states that it "means, with respect to an individual who is not a patient (as defined in this section), the individual" has presented at the emergency department and requests treatment for a medical condition, has presented on hospital property and requests treatment for what may be an emergency medical treatment, or is in an ambulance for purposes of treatment in the hospital's emergency department (under certain conditions). 42 C.F.R. § 489.24(b) (emphasis added). "Emergency department" is defined as any department or facility that (a) is licensed as an emergency department, (b) is held out to the public as a place that provides care for emergency medical conditions on an urgent basis without a prior appointment, or (c) in the previous calendar year provided at least one-third of all its outpatient visits for the treatment of emergency medical conditions on an urgent basis without a prior appointment. *Id.* "Patient" is defined as a person who has begun to receive outside patient services (under certain circumstances) or an individual who has been admitted as an inpatient. *Id.*

[8] 42 C.F.R. § 489.24(b)'s definition of "to stabilize" is the same as the definition in 42 U.S.C. § 1395dd(e)(e)(A), meaning, to provide such treatment to assure that no material deterioration is likely to result from or occur during transfer. *See supra* n.4.

> individual to have an emergency medical condition, **and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition**, the hospital has satisfied its special responsibilities under this section with respect to that individual.

42 C.F.R. § 489.24(d) (emphasis added). The CMS Regulations also define the term "inpatient:"

> Inpatient means an individual who is admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services as described in § 409.10(a) of this chapter with the expectation that he or she will remain at least overnight and occupy a bed even though the situation later develops that the individual can be discharged or transferred to another hospital and does not actually use a hospital bed overnight.

42 C.F.R. § 489.24(b). Section 409.10(a) defines "inpatient hospital services" as a series of services:

> (1) Bed and board.
>
> (2) Nursing services and other related services.
>
> (3) Use of hospital and CAH [Critical Access Hospital] facilities.
>
> (4) Medical social services.
>
> (5) Drugs, biologicals, supplies, appliances, and equipment.
>
> (6) Certain other diagnostic or therapeutic services.
>
> (7) Medical or surgical services provided by certain interns or residents-in-training.
>
> (8) Transportation services, including transport by ambulance.

42 C.F.R. § 409.10(a).[9]

## II. THE EMTALA CLAIM

There are two issues: (A) whether Ms. Lopez's admission precludes EMTALA liability; and (B) whether EMTALA's stabilization requirements apply to a patient who is not transferred.

**A. Whether Mrs. Lopez's Admission Precludes EMTALA Liability**

To put the issue in context, the allegations are that (1) Ms. Lopez had an emergency medical condition, (2) the hospital did not have the staff and facilities to stabilize her emergency medical condition, (3) knowing that, it admitted her anyway and thus the admission was "not made in good faith to stabilize [her] . . . emergency medical condition," and (4) the admission was a substantial

---

[9] 42 C.F.R. § 409.10(b) excludes services that are not relevant here from the definition of inpatient hospital services.

ORDER ( C 12-03726 LB)    8

part of causing her death. FAC ¶¶ 5-7. CCRMC argues that the allegations establish that Mrs. Lopez was admitted to CCRMC, which precludes EMTALA liability. Motion, ECF No. 22 at 7-8. Mr. Lopez's best argument is that the hospital admitted Ms. Lopez under EMTALA to stabilize her, and the admission was not in good faith because the hospital knew it did not have the ability to stabilize her. Opp'n at 2. EMTALA requires treatment to stabilize or transfer to another facility, and under 42 C.F.R. § 489.24(d)(2), admission to stabilize the emergency medical treatment must be in good faith. *Id.*

The EMTALA statutes and CMS regulations require the following.

First, when an individual "comes to a hospital emergency department" and requests treatment for an emergency medical condition, the hospital must "provide an appropriate medical screening examination within the capability of the hospital's emergency department." 42 U.S.C. § 1395dd(a); 42 C.F.R. § 489.24(a)(1).

Second, if the hospital detects an emergency medical condition and does not admit the individual, then it must provide either (a) the treatment "within the staff and facilities available at the hospital for such further medical examination and such treatment as may be required to stabilize the medical condition, meaning, the treatment to assure with reasonable medical probability that no material deterioration will happen during a transfer, or (b) for transfer to another medical facility under one of the exceptions described in section 1395dd(c) (set forth above on page 6).[10] *See* 42 U.S.C. § 1395dd(b)(1); 42 U.S.C. § 1395dd(b)(1); 42 C.F.R. §§ 489.24(a), (b) and (d).

Third, if the hospital perform the screening of the emergency medical condition and admits the individual as an inpatient either for further treatment or in good faith in order to stabilize[11] the emergency medical condition, then the hospital has satisfied its responsibilities with respect to the

---

[10] In boiled down form, section 1395(dd)(c)'s exceptions and requirements are as follows: (a) the transferring hospital's providing the best treatment it is capable of; (b) a transfer with medical records and informed consent; (c) appropriately-trained transferring personnel; and (d) a qualified receiving facility that accepts transfer. *See supra* p. 6.

[11] Again, "to stabilize" means essentially to provide such treatment to assure that no material deterioration is likely to result from or occur during transfer. *See* 42 U.S.C. § 1395dd(e)(e)(A); 42 C.F.R. § 489.24(b); *supra* n.3.

ORDER ( C 12-03726 LB)    9

individual. *See* 42 C.F.R. §§ 489.24(a)(1)(ii) and (d)(2)(ii); *Bryant v. Adventist Health Systems/West*, 289 F.3d 1162, 1170 (9th Cir. 2002) ("EMTALA generally ceases to apply once a hospital admits an individual for inpatient care . . . .").

The first issue is whether the delivery department is an emergency department. The parties disagree whether it is. The complaint pleads that it is. This is a fact issue.

The second issue is whether Ms. Lopez was a patient before she was admitted to the post-partum floor. The complaint pleads sufficiently that she was not.[12]

The third issue is whether the allegations establish that Ms. Lopez had an emergency medical condition and that CCRMC detected it. They do.

The fourth issue is whether the hospital admitted Ms. Lopez either (a) for further treatment or (b) in good faith in order to stabilize the emergency medical condition, meaning, to provide such treatment to assure that no material deterioration is likely to result from or occur during transfer. *See* 42 U.S.C. § 1395dd(e)(e)(A); 42 C.F.R. § 489.24(b); *supra* n.4. The critical new allegation in the SAC is that, knowing that it did not have the staff or facility to stabilize her, the hospital admitted her, and thus, the admission was "not made in good faith to stabilize [her] . . . emergency medical condition." SAC ¶ 5. The inquiry is whether that allegation renders the "good faith" of CCRMC a fact issue.

The court holds that – at the pleadings stage – the fact allegations state a claim. If CCRMC admitted Ms. Lopez for treatment, its EMTALA liability is cut off, and Mr. Lopez states only a medical malpractice claim. *See Harry v. Marchant*, 291 F.3d 767, 771 (11th Cir. 2012); *Bryant v. Adventist Health Systems/West*, 289 F.3d 1162, 1169 (9th Cir. 2002). But if – as Mr. Lopez

---

[12] As the previous order discussed, as to whether Mrs. Lopez was admitted as inpatient, the definition of inpatient in 42 C.F.R. § 289.24(b) and 42 C.F.R. § 409.10(a) – an individual who is admitted to bed occupancy who is expected to remain overnight and receive inpatient services that include bed and board, nursing services, use of hospital facilities, drugs, diagnostic or therapeutic services, and medical or surgical services – may suggest that her arrival at the labor and delivery department was an admission. *See* 1/8/13 Order, ECF No. 20 at 10; *supra* p. 7 n.8 (setting forth the definition for "patient"). The parties agreed, and the regulations support the conclusion, that – at least at the pleadings stage – a hospital delivery room is an emergency department, and thus Ms. Lopez was not a patient until she was admitted to the postpartum floor.

ORDER ( C 12-03726 LB)   10

plausibly alleges – the hospital admitted her to stabilize her (within the statute's meaning of "to stabilize") and did not have the facilities to do so, then there is a fact issue about the hospital's good faith in doing so.[13]

As the prior order explained, for example, a ruse admission for stabilization might allow an EMTALA claim:

> [A] hospital cannot escape liability under EMTALA by ostensibly 'admitting' a patient, with no intention of treating the patient, and then discharging or transferring the patient without having met the stabilization requirement. In general, however, a hospital admits a patient to provide inpatient care. We will not assume that hospitals use the admission process as a subterfuge to circumvent the stabilization requirement of EMTALA. If a patient demonstrates in a particular case that inpatient admission was a ruse to avoid EMTALA's requirements, then liability under EMTALA may attach.

*Bryant*, 289 F.3d at 1169 (citing 42 U.S.C. §§ 1395dd(b)(1), 1395dd(e)(3)(A). *Bryant* and *Harry v. Marchant* both predate the EMTALA regulations. But the analysis applies. If the hospital admitted Ms. Lopez, negligence is not enough, and there is no EMTALA liability. By contrast, if the hospital admits to stabilize for transfer, and that admission is not in good faith (and an example might be a ruse or insufficient staff or facilities), then liability under EMTALA may attach.

Mr. Lopez pled facts about the lack of good faith. CCRMC may well be right that it admitted Ms. Lopez as a patient (and not to stabilize for transfer), but that is an issue for summary judgment.

**B. Whether CCRMC Had a Duty to Stabilize Mrs. Lopez**

CCRMC argues that because CCRMC cannot be liable under EMTALA for failure to stabilize a patient it does not transfer. Motion, ECF No. 16 at 8-10. Mr. Lopez responds that the "duty" to stabilize arises regardless of whether a patient is transferred. Opposition, ECF No. 23 at 3-4.

As discussed in the previous section, when a hospital detects an emergency condition, it can admit the individual for treatment, and it also may provide treatment to stabilize for the individual's transfer to another facility. *See* 42 U.S.C. § 1395dd(b)(1); 42 U.S.C. § 1395dd(b)(1); 42 C.F.R.

---

[13] The court appreciates the tensions between 42 C.F.R. § 489.24(a)(1)(i)'s absolute cut-off of EMTALA liability at admission and 42 C.F.R. § 489.24(d)(2)(i)'s cut-off of EMTALA liability for a good-faith admission to stabilize, but given section 489.24(a)(1)(i)'s explicit cross-reference to section 489.24(d)(2)(i), the court will not resolve this issue at the pleadings stage, especially because the fact issue of good faith may be dispositive at summary judgment. Indeed, these issues generally are addressed at summary judgment.

ORDER ( C 12-03726 LB)    11

§§ 489.24(a), (b) and (d). And if it admits the individual either for further treatment or in good faith in order to stabilize the emergency medical condition for the patient's transfer, the hospital meets its responsibilities under EMTALA. *See* 42 C.F.R. §§ 489.24(a)(1)(ii) and (d)(2)(ii). "To stabilize" means "to provide such medical treatment of the condition necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to occur from or during the transfer of the individual" to another facility that can treat the individual. 42 C.F.R. § 1395dd(e)(3)(A).

To the extent that Mr. Lopez argues that EMTALA argues that the hospital requires patients to stabilize patients regardless of whether they are transferred, the court disagrees. EMTALA does not establish a federal malpractice standard. *See Bryant,* 289 F.3d at 1166. A plain reading of the statute's definition of "to stabilize" establishes that the duty is about the transfer to a facility that can treat the emergency medical condition. *See Harry v. Marchant,* 291 F.3d at 770-72. On the other hand, the court does not agree with CCRMC that because Ms. Lopez was not transferred, there is necessarily no EMTALA liability. The issue here is whether she was admitted to stabilize, and whether that admission was in good faith. That is the claim that Mr. Lopez states.

### III. SUPPLEMENTAL JURISDICTION

Mr. Lopez states a federal claim, and the court does not reach this issue.

### CONCLUSION

The court denies , the court **DENIES** CCRMC's motion to dismiss Mr. Lopez's EMTALA claim.

This disposes of ECF No. 22.

**IT IS SO ORDERED.**

Dated: April 5, 2013

_____
LAUREL BEELER
United States Magistrate Judge