UNITED STATES DISTRICT COURT
For the Northern District of California

1

2

3

4

5

6

7

8           UNITED STATES  DISTRICT COURT

9              Northern District of California

10                 San Francisco Division

11   JESUS LOPEZ, for himself and as the          No. C 12-03726 LB
     Guardian ad Litem for EDGAR LOPEZ,
12   ALEXANDRA LOPEZ, and GRETSANDY
     LOPEZ, his minor children,                   **ORDER GRANTING DEFENDANTS'**
13                                                 **MOTION FOR SUMMARY**
                          Plaintiff,               **JUDGMENT ON EMTALA CLAIM**
14         v.                                      [ECF No. 33]
15   CONTRA COSTA REGIONAL MEDICAL
     CENTER and COUNTY OF CONTRA
16   COSTA,
17                         Defendants.
     _____/
18

19                        **INTRODUCTION**

20       Plaintiff Jesus Lopez in his individual capacity and as the guardian ad litem for his three minor

21   children Edgar, Alexandra, and Gretsandy Lopez, sued Defendants Contra Costa Regional Medical

22   Center and County of Contra Costa (together, "CCRMC") for medical malpractice and for violating

23   the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd,

24   following the death of Mr. Lopez's wife from complications after she gave birth at Contra Costa

25   Regional Medical Center.  ECF No. 21.[1]  Defendants moved for summary judgment on the ground

26   _____

27        [1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-
     generated page numbers at the top of the document.  The relevant medical records are exhibits to the
28   summary judgment motion and are cited by exhibit number.

1    that it has no liability under EMTALA because the undisputed evidence shows that Mrs. Lopez was

2    admitted to the hospital as an inpatient for treatment of her emergency medical condition. *See*

3    Motion for Summary Judgment ("MSJ"), ECF No. 33. Plaintiffs respond that there are fact issues

4    about when CCRMC admitted Mrs. Lopez as an inpatient, whether it admitted her to stabilize her

5    emergency medical condition, and if so, whether that admission was in good faith. *See* Opposition,

6    ECF No. 34 at 6; Supplemental Opposition, ECF No. 53. Because the undisputed evidence shows

7    that Mrs. Lopez was admitted as an inpatient for treatment of her emergency medical condition, the

8    court grants Defendants' summary judgment motion on the EMTALA claim.

9                                                   **STATEMENT**

10   **I. UNDISPUTED FACTS[2]**

11        Mr. Lopez is the surviving spouse of Sandra Lopez, and Edgar, Alexandra, and Gretsandy Lopez

12   are their children. SAC, ECF No. 21, ¶¶ 2-3. Mrs. Lopez (then age 29) became pregnant in late

13   2010 or early 2011 and received prenatal care through Contra Costa Health Services from February

14   to September 2011. *See* Joint Statement of Undisputed Facts ("JSUF") #1, ECF No. 38. This was

15   her third pregnancy. During labor in her second pregnancy, she experienced severe preeclampsia,

16   which was treated by CCRMC, and she was discharged after delivering her baby. JSUF # 4-16.

17        On September 29, 2011, Mrs. Lopez called CCRMC at 10:15 p.m. and reported that her

18   contractions were five to ten minutes apart. JSUF #2. A nurse advised her to "eat a meal, shower,

19   and [] come in to the hospital when her contractions were 5 minutes apart." *Id.* By 11:00 p.m., Mrs.

20   Lopez was at CCRMC because an admit nurse noted "pt. direct admit for labor" on her "Labor

21   Progress Record." JSUF #3; *see* MSJ Ex. A-10, ECF No. 33-1 at 10. The label at the top of the

22   Labor Progress Record has Mrs. Lopez's name and other identifying information. *See* MSJ Ex. A-

23   10, ECF No. 33-1 at 10. The label has "Admit Date: 09/29/11" and a bar at the bottom edge of the

24   label says "INPT." *Id.* This label is repeated on Mrs. Lopez's other medical records. *See* MSJ Exs.

25   _____

26        [2] The facts are from the Joint Statement of Undisputed Facts, the medical records, and the
     deposition testimony of Louise Jones, the nurse who was the medical center supervisor working the
27   4:00 p.m. to midnight shift on September 29, 2011. The parties do not object to admissibility, and
     the order addresses their disagreements about the significance of the evidence in the "Analysis."
28

UNITED STATES DISTRICT COURT
For the Northern District of California

A-1 – A91.  Mrs. Lopez's "Patient Registration Face Sheet" indicates that her "ADMIT DATE" was "9/29/11" and her "ADMIT TIME" was "23:19."  Ex. A-1.

Louise Jones, a nurse and the medical center supervisor working the 4:00 p.m. to midnight shift on September 29, 2011 (and one of nine medical center supervisors), testified in her deposition that each unit has its own protocol for admitting patients.  Jones Depo., ECF No. 53-1 at 1:13, 4:17-18, 5:5-7.  A nurse admits patients under the guidance of a physician.  *Id.* at 4:19-20.  Admission requires a physician's written order, and there are standard orders.  *Id.* at 4:21-25 to 5:1-4.  She explained the "Labor Progress Form" as follows.  The label  "pt. direct admit for labor" means that the patient goes directly to the OB Department.  Jones Depo., ECF No. 55-1 at 9:8-20.  The OB department is different than other departments in that the patient goes directly to the department (rather than being admitted through another department).  *Id.*  The label "Admit Date: 09/29/11" means that Mrs. Lopez was admitted on that date.  *Id.* at 9:20-24.  The Department has standard orders for every vaginal delivery and for every C section delivery.  *Id.* at 10:3-6.  If someone comes in for a delivery, the orders to admit go into effect automatically.  *Id.* at 10:7-13.  The doctor does not have to write the orders.  *Id.* at 10:10-12.

Starting at least 11:00 p.m., CCRMC physicians and nurses provided Mrs. Lopez with medical care, including repeatedly monitoring her rising blood pressure, ordering lab tests, putting her on an IV, and administering medications to her.  *See* JSUF #4-10.

| Time | Event | Support |
|------|-------|---------|
| 11:00 p.m. | Admitted (nurse note "pt. direct admit for labor"); completely dilated (per resident David Carey, M.D.) | JSUF #3 |
| 11:05 p.m. | IV Started; patient tolerated procedure well; blood pressure 165/105. | JSUF #4 |
| 11:06 p.m. | Blood pressure 172/100; patient complains of headaches and epigastric pain.  Dr. Carey and ob/gyn and attending physician Huy D. Dao, M.D., were at the bedside. | JSUF #5 |
| 11:14 p.m. | Blood pressure 187/109. | JSUF #6 |
| 11:17 p.m. | Dr. Carey ordered PIH panel STAT, UA STAT, and Hydralazine. | JSUF#7 |
| 11:20 p.m. | Patient was given 5 mg. of Hydralazine; blood pressure was 195/108. | JSUF #8 |
| 11:28 p.m. | Patient given 5 mg. of Hydralazine; blood pressure was 178/114. | JSUF #9 |

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   At 11:30 p.m.,[3] Dr. Carey charted his "OB History and Physical."  JSUF #10; *see* MSJ Ex. A-12.

2   Mrs. Lopez's chief complaints were uterine contractions, headache, and epigastric pain.  JSUF #10.

3   Dr. Carey obtained a history and performed a physical examination.  *Id.*  His assessment was that

4   Mrs. Lopez was presenting with active labor, high blood pressure, epigastric pain, and severe

5   preeclampsia.  *Id.*  Dr. Carey's plan was "STAT PIH panel, UA STAT, Hydralazine" (anti-

6   hypertensive medication), and "consider mg" (magnesium sulfate to prevent seizures).  *Id.*  A

7   magnesium bolus was administered to Mrs. Lopez at 11:33 p.m.  *See id.*  Her blood pressure was

8   182/103.  JSUF #11.  At 11:35 p.m., a "4 gm. Magnesium bolus was started for seizure prophylaxis.

9   The patient and the fetus were assessed."  JSUF #12.  At 11:37 p.m., Dr. Carey placed a fetal scalp

10  electrode.  The patient was pushing at that point.  JSUF #13.  At 11:40 p.m., the patient "was

11  pushing well and the baby was tolerating the labor well."  JSUF #14.

12  At 11:45 p.m., Mrs. Lopez gave birth to a baby girl.  *See* JSUF #15.  CCRMC staff continued to

13  treat Mrs. Lopez.  *See* JSUF #16-20.

| Time | Event | Support |
|------|-------|---------|
| 11:50 p.m. | Magnesium bolus complete. | JSUF #16 |
| 11:53 p.m. | The placenta delivered. | JSUF #17 |
| 11:56 p.m. | Postpartum recovery record shows blood pressure 161/92. | JSUF #18 |

18  At 12:01 a.m. (now September 30), Dr. Carey wrote "Labor & Delivery Pre-Eclampsia

19  Postpartum Orders" for Mrs. Lopez.  JSUF #19; *see* Ex. A-16.  These included ordering an IV

20  infusion to be discontinued at 24 hours post-partum.  *See* Ex. A-16.  At 12:17 a.m., Mrs. Lopez's

21  blood pressure was 158/85.  JSUF #20.  At 12:19 a.m., Dr. Carey assessed Mrs. Lopez to have

22  severe preeclampsia with elevated liver enzymes stable now.  Her blood pressure was back in the

23  normal range.  He ordered Mrs. Lopez to be given magnesium for the next 24 hours and to "recheck

---

[3]  Dr. Carey's "OB History & Physical" was recorded at 11:30 p.m.  *See* Ex. A-12.  This record summarizes the examination and treatments that had already taken place or were in progress.  *Compare* JSUF #5-9 (undisputed facts that Dr. Carey and Dr. Dao were at Mrs. Lopez's bedside at 11:06 p.m. and that Dr. Carey ordered "PIH panel STAT, UA STAT, and Hydralazine" at 11:17 p.m.) *with* OB History & Physical, Ex. A-12 (noting same exam observations and treatment plan).

labs" in 8 hours.  JSUF #21.

At 12:30 a.m., Mrs. Lopez complained of 10/10 headache pain and wanted pain medications. JSUF #22.  At 12:32 a.m., she was given "4 mg Morphine Sulfate," and her blood pressure was 141/87.  JSUF #23.  At 12:43 a.m., she was given 2 grams of Magnesium.  JSUF #24.  At 12:47 a.m., her blood pressure was 137/76.  JSUF #25.  At 1:00 a.m., she said her "pain was now 8/10." JSUF #26.

At 1:03 a.m. on September 30, 2011, Dr. Carey filled out a "Labor & Delivery Pre-Eclampsia Admit Orders" form.  JSUF #27; *see* Ex. A-19.  Under the heading "Admission Status," Dr. Carey checked the box for "Admit to Labor & Delivery."  *See* JSUF #27; *see* Ex. A-19.  He did not check the box for "Maintain triage status pending further work-up/possible transfer."  JSUF #27; Ex. A-19. The upper right hand part of the form has Mrs. Lopez's Admit date as "09/29/11" and the words "INPT" next to her name.  Ex. A-19; *see also generally* Ex. A (most of the medical records bear this stamp in the upper right-hand corner).

At 1:17 a.m., Mrs. Lopez's blood pressure was 129/72, and at 1:47 a.m., it was 118/71.  JSUF #28-29.  At 2:30 a.m., Mrs. Lopez was transferred from labor and delivery via wheelchair to room 5CP16 in the postpartum unit, and "Report was given to the nurse."  JSUF #30; *see* Exs. A-63, A-70. Her complaint of headache pain "had decreased to 7/10."  *Id.*  At 2:45 a.m., her blood pressure was 112/85.  JSUF #31.  At 3:00 a.m., her blood pressure was 112/86.  JSUF #32.  At 3:30 a.m., CCRMC gave her Motrin for her headache pain.  JSUF #33.

At 3:35 a.m., Dr. Carey dictated a note that following Mrs. Lopez's delivery:

> PIH panel returned and was noted to be significant for severely elevated AST and ALT in the 700 range, as well as low platelets of 122.  Patient will be continued on magnesium for 24 hours postpartum and a recheck of labs in 8 hours.  Blood pressure now is back in the normal range.  Mom and baby are currently stable.

*See* JSUF #34 (summarizing quotation from Ex. A-14).  At 5:00 a.m., Mrs. Lopez's blood pressure was 139/87.  JSUF #35.  At 6:30 a.m., lab results, including low platelets, were reported to Dr. Carey.  JSUF #36.  At 7:00 a.m., her blood pressure was 125/79.  JSUF #37.  At 8:00 a.m., it was 129/83, and the patient "was evaluated as stable post-partum" and "was feeling tired and wanted to sleep."  JSUF #38.  The "PIH panel at 4:00 a.m. result was reported to Dr. Carey.  A repeat PIH

1    panel was to be done at 7:00 a.m." JSUF #38.  At 8:45 a.m., Mrs. Lopez was given Vicodin for a

2    headache at the level 7/10, and the pain decreased to 5/10.  JSUF #39.

3        Family practitioner Dr. Neary Arpajirakul evaluated Mrs. Lopez at 9:10 a.m.  JSUF #40.  Dr.

4    Arpajirakul's notes refer to HELLP (hemolysis, elevated liver enzyme, and low platelet count)

5    syndrome and severe preeclampsia, and his treatment plan included considering transferring Mrs.

6    Lopez to the Intermediate Care Unit ("IMCU") if needed.  JSUF #40; *see* Ex. A-28.  At 10 a.m., the

7    patient's blood pressure was 141/86, and "platelets decreased and were now 21."  JSUF #41.  Sulfate

8    therapy was to be discontinued, and Dr. Arpajirakul evaluated Mrs. Lopez and was aware of the lab

9    results.  *Id.*  Mrs. Lopez was pale with generalized weakness and "was to be kept under

10   observation."  *Id.*

11       At 11:00 a.m., "the nurse charted that lab results were reported to Dr. Hay and Dr. Arpajirakul

12   was aware of the [lab] results."  JSUF #42.  "The patient's diagnosis was HELLP syndrome, severe

13   preeclampsia."  *Id.*  Dr. Hay saw Mrs. Lopez and ordered the nurse to prepare her for transfer to the

14   Intermediate Care Unit.  *Id.;* Exs. A-64, A-85.  At 11:30 a.m., the nurse charted that "the patient was

15   evaluated" and had "no signs of respiratory distress" and also was seen by a social worker.  JSUF

16   #43.  At 12:00 p.m., Mrs. Lopez's blood pressure was 193/104, and she complained of headache

17   pain and was given Motrin.  JSUF #44.  She "had a scant amount of emesis times 1."  *Id.*  At 12:25

18   p.m., her blood pressure was at 175/93, and at 12:30 p.m., it was 189/95.  JSUF ##45-46.  "The

19   patient's blood pressures of 183/104 - 175/83 were reported to Dr. Arpajirakul and Dr. Hay," and

20   Dr. Hay "ordered Hydralizine by telephone order.  The patient had a moderate amount of emesis

21   times 1."  Dr. Arpajirakul and Dr. Hay were notified.  The plan was to transfer the patient to the

22   [Intermediate Care Unit] for further close observation."  JSUF#46.

23       At 12:45 p.m., while Mrs. Lopez was being transferred to the Intermediate Care Unit, she

24   suffered a tonic-clonic seizure in the hallway, which was witnessed by an LVN, a CNA, Dr. Hay,

25   and Dr. Richard McIlroy, who all were with Mrs. Lopez for transport.  JSUF #47.  Mrs. Lopez was

26   taken to the Intensive Care Unit (ICU)", "where she was noted to have a fixed and dilated left pupil

27   and right toes upgoing."  JSUF #48.  Mrs. Lopez was "intubated emergently and taken to the CT

28   scan."  *Id.*  From the CT scan, "both pupils were fixed and dilated, no reflexes were noted and no

UNITED STATES DISTRICT COURT
For the Northern District of California

1    withdrawal from pain.  The CT scan showed massive intracranial hemmorrhage with likely

2    herniation."  JSUF #49.

3         At 2:00 p.m., the patient ICU/IMCU Admission orders were written by resident Katherine

4    Goheen, M.D., and the attending physician was Dr. Freedman.  JSUF #50.  Between 12:45 p.m. and

5    3:00 p.m., Mrs. Lopez was evaluated by neurologist Mark Van Handel, M.D., and the "impression

6    was devastating right parietal intracranial hemorrhage with subarachnoid extention, likely due to

7    patient's preeclampsia and low platelet count."  JSUF #51.  "The patient's examination was

8    consistent with a severe terminal herniation event."  *Id.*  "The patient was promptly started on

9    Mannitol, hyperventilation, and raising the head of the bed upon reviewing the CT scan."  *Id.*

10   "It was not felt that the patient would benefit from surgical intervention, and this was additionally

11   confirmed on phone discussion with Dr. Adey at John Muir Neurosurgery."  *Id.*

12        Mrs. Lopez was declared dead on October 1, 2011 at 12:10 a.m.  JSUF #52.

13        On October 17, 2011, resident Erin Helgerson, M.D., dictated a "Discharge Summary" about

14   Mrs. Lopez's treatment.  JSUF #53; *see* Ex. A-86.  Dr. Helgerson was not involved in Mrs. Lopez's

15   postpartum care, but "it was her understanding that [Mrs. Lopez]'s lab[ resul]ts on September 30,

16   2011, including her platelets and liver function tests (LFs) were significantly worse than [her lab

17   results] on September 29, and the decision was made to transfer the patient to Intensive Care.  There

18   were no beds available in the ICU in the morning of September 30, 2011, so she remained on

19   postpartum until around noon or 1:00 p.m. on September 30, 2011, at which time she was noticed to

20   be having seizure-like activity.  The nurses and Dr. McIlroy who met them in the hallway brought

21   her down to the ICU."  JSUF #53.

22   **II.  ADDITIONAL EVIDENCE FROM JONES DEPOSITION**

23        Ms. Jones, the medical center supervisor who worked the 4:00 p.m. to midnight shift on

24   September 29, 2011 was deposed on January 10, 2014.  *See* Walker Decl., ECF No. 55 at 10; Jones

25   Depo., Ex. E to Walker Decl., ECF No. 55-1 at 1.  At her deposition, she testified that there were

26   eight beds in the ICU, reviewed the hospital records in Exhibit 2 to the deposition (a "census" of

27   how many patients were in the ICU), and testified about the bed space there.  *See* ECF No. 55-1 at

28   4:9-5 & Ex. 2, ECF No. 55-1 at 16-19.  The records that she reviewed were the shift censuses for the

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   shifts during the relevant time periods on September 29 and September 30, 2011. *Id.* at 4:24-5:2.

2   The census reports are for the night shift (10:00 or 11:00 p.m. to 8:00 a.m. because the staff has

3   staggered shifts), the day shift (7:00 a.m. to 3:30 p.m.), and the p.m. shift (presumably starting at

4   3:30 p.m.). *See id.* 5:1-14. Each census showed bed availability during the census. For example,

5   the night shift census shows a census of six, meaning two beds were available. *Id.* at 5:18-21, 7:20-

6   25. The census for the morning of September 30th (7:00 a.m. to 3:30 p.m.) shows there was a

7   census of seven (of eight beds in the ICU). *Id.* at 5:24-25. The census does not show hour-by-hour

8   what beds are available, and bed availability changes during the shift. *Id.* at 8:7-21. It is only a

9   census, and thus Ms. Jones cannot say at any given time how many beds are available. *Id.* The

10   assignment sheets would track the patients there at any given time. *Id.* at 7:3-21-8:-21.

11   **III. NIPOMNICK DECLARATION**

12       CCRMC submitted an expert declaration from Elliot Nipomnick, M.D., F.A.C.E.P. ("Fellow of

13   the American College of Emergency Physicians"), an emergency room physician who reviewed the

14   medical records and opined that they show that the hospital did not violate EMTALA. *See* ECF No.

15   33 at 19-28. Page 19 states his qualifications, which also are set forth in his curriculum vitae at ECF

16   No. 33-6. Pages 20 to 26 summarize the medical records and are consistent with the JSUF. Pages

17   27 and 28 contain his conclusions and opinions.

18       **A. Qualifications**

19       Dr. Nipomnick is a physician licensed to practice medicine in California, and he has practiced

20   emergency medicine since 1979. *Id.* Since 1994, he has "provided expert professional review on

21   EMTALA and the standard of care for a variety of public and private entities, including the Medical

22   Board of California, H.S.A.G., and Lumetra," and he has lectured on "various EMTALA issues."

23   *Id.*; *see also* Dr. Nipomnick's curriculum vitae, ECF No. 33-6 at 17.

24       **B. Conclusions and Opinions**

25       Dr. Nipomnick states the following conclusions or opinions on pages 27 and 28.

26       First, "[t]he records reflect that Sandra Lopez was admitted to Contra Costa Regional Medical

27   Center on September 29, 2011 at approximately 11:00 p.m. for completion and subsequent delivery

28   with related care." Nipomnick Decl., ECF No. 33 at 26.

Second, "[t]he records also reflect that Sandra Lopez was provided with treatment for both her pregnancy and her preeclampsia.  Mrs. Lopez presented to the OB Department at [CCRMC] with a 40-week pregnancy and a history of preeclampsia.  She was in labor and ready to deliver.  She was assessed and admitted to the hospital for delivery.  Thereafter, the patient delivered a healthy baby girl." *Id.*

Third, "Mrs. Lopez's diagnostic tests performed at the time she presented to the hospital and thereafter disclosed preeclampsia and HELLP syndrome.  Preeclampsia is a medical condition characterized by high blood pressure and significant amounts of protein in the urine of pregnant women.  If left untreated, it can develop into eclampsia, the life threatening occurrence of seizures during pregnancy.  HELLP syndrome is also a life threatening obstetric complication usually considered to be a variant or complication of preeclampsia.  "HELLP" stands for the three main features of the condition: hemolysis (the rupturing of red blood cells); elevated liver enzymes; and, low platelet count." *Id.* at 27.

Fourth, Mrs. Lopez "was treated with laboratory tests to identify these conditions, specifically, PIH panels (CBC, LFTs, Uric Acid, PUN, Creatinine), urinalysis, and 24 hour urine protein.  During labor and post-natally, she was treated with medications to address these conditions: Hydralazine, an anti-hypertensive, and Magnesium Sulfate, for seizure prophylaxis.  The patient was also treated with repeat blood pressure checks.  These blood pressure checks disclosed that the patient's high blood pressure decreased with the delivery of the child, as would be expected.  She was stabilized for a short period of time.  Thereafter, she had a manifestation of eclampsia, with an increase in her blood pressure.  The patient sustained a cerebral bleed and eventually died." *Id.*

Fifth, "[b]ased on my review of the aforementioned records along with my education, training, and experience, it is my opinion that Mrs. Lopez was admitted to the hospital at approximately 11:00 p.m. on September 29, 2011 and therefore was a hospital inpatient during the relevant time. Following her admission, based on the aforementioned records, she received nursing services as well as other related care as well as drugs and related supplies.  She underwent diagnostic and therapeutic testing and was under the care of several doctors during the relevant time who provided medical as well as surgical services." *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Sixth, "[t]his was an unusual case in that the patient developed eclampsia following delivery

2    which is highly improbable.  With the manifestation of the eclampsia following the care and

3    treatment of preeclampsia before the delivery, the physicians and other hospital personnel undertook

4    to treat the patient.  Unfortunately, their efforts did not prove successful." *Id.*

5        Seventh, "[b]ased on the foregoing, my opinion is that the patient received a timely medical

6    screening exam from which an emergency medical condition was determined to be present.  She

7    was already an inpatient, so the care providers stabilized her and continued to provide definitive

8    care.  From all indications, CCRMC had both the capability and capacity to render care to Ms.

9    Lopez and, given this unusual post-delivery complication, transfer to another facility would have

10   further jeopardized the patient's prognosis and was not indicated since nothing in her records

11   state that the post-stabilization bleed could have been foreseen." *Id.* at 28.

## III. PROCEDURAL HISTORY

13       Mr. Lopez filed his lawsuit suit in July 2012, alleging EMTALA and medical malpractice

14   claims, and the court appointed him guardian ad litem for his three minor children.  *See* Compl.,

15   ECF No. 1; Order, ECF No. 7.  The court dismissed his first two complaints for failure to state an

16   EMTALA claim, the first on the ground that "failure to transfer an admitted hospital patient" does

17   not violate the EMTALA, and the second (which alleged that the hospital did not admit Mrs. Lopez

18   in good faith to stabilize her emergency medical condition) on the ground that the complaint alleged

19   no facts about lack of good faith.  *See* Orders, ECF Nos. 14, 20.  The court thereafter denied

20   CCRMC's motion to dismiss the second amended complaint, holding that the complaint plausibly

21   pled that the hospital admitted Mrs. Lopez under the EMTALA to stabilize her, and the admission

22   was not in good faith because it did not have the ability to stabilize her.  Order, ECF No. 26 at 9.

23   Specifically, the court noted issues of fact more appropriate for summary judgment than for a motion

24   to dismiss: (1) whether the delivery department was an emergency department; (2) whether Mrs.

25   Lopez was a patient before she was admitted to a post-partum floor; (3) whether Mrs. Lopez had an

26   emergency medical condition that CCRMC detected; and (4) whether the hospital admitted Mrs.

27   Lopez, knowing that it did not have the ability to stabilize her for transfer (and thus that the

28   admission was not made in good faith to stabilize her under the EMTALA).  *Id.* at 10-11.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

1    The court scheduled the summary judgment hearing initially for November 21, 2013. *See*

2    11/16/13 Order, ECF No. 40 at 2. Mr. Lopez's opposition mentioned fact discovery issues, and the

3    court issued a revised briefing schedule that called for a revised opposition and a revised reply after

4    discovery closed on the EMTALA claim. *See id.* The parties then asked the case to go forward in

5    November anyway because the discovery responses at issue did not provide relevant additional

6    information. *See* Becker Letter, ECF No. 42; 11/18/13 Order, ECF No. 43 at 2. The court denied

7    that request, noting that until EMTALA fact discovery closed, it would not entertain an EMTALA

8    summary judgment motion. *See* 11/18/13 Order, ECF No. 43 at 2; 2/18/14 Order, ECF No. 56 at 2

9    (chart with deadlines for EMTALA discovery). In its November 18, 2013 order and at the

10   December 12, 2013 case management conference, the court also expressed its concern that

11   Defendants had submitted an expert declaration on the issue of whether Mrs. Lopez was admitted as

12   an inpatient, and Plaintiffs had not submitted any expert evidence. *See* 11/18/13 Order, ECF No. 43

13   at 2; 12/12/13 Amended Civil Minute Order, ECF No. 50; 2/18/14 Order, ECF No. 56 at 2. The

14   court set deadlines to permit Plaintiffs to disclose and use an EMTALA expert. *See* 12/12/13

15   Amended Civil Minute Order, ECF No. 50; Stipulation, ECF No. 52; 2/18/14 Order, ECF No. 56.

16   Despite the court's giving Plaintiffs an opportunity to submit an expert declaration regarding the

17   alleged EMTALA issue, Plaintiffs elected not to do so.

18       The court held a hearing on the summary judgment motion on February 20, 2014. *See* 2/20/14

19   Minute Order, ECF No. 57.

20                                              **ANALYSIS**

21       CCRMC argues that it has no liability under the EMTALA because the undisputed evidence

22   shows that Mrs. Lopez was admitted to the hospital as an inpatient for further treatment of her

23   emergency medical condition. *See* MSJ, ECF No. 33 at 14-16. Mr. Lopez disagrees, arguing that

24   while EMTALA liability ends when a hospital admits an individual in good faith to stabilize an

25   emergency medical condition such as Mrs. Lopez's HELLP syndrome, there are fact issues about

26   when the admission happened and whether the admission to Labor and Delivery was in good faith

27   given that the situation was life-threatening, required a bed in the ICU, and no bed was available.

28   Opposition, ECF No. 34 at 6.

1    **I. STANDARDS**

2        **A. Summary Judgment**

3        A court should grant a motion for summary judgment if there is no genuine issue of material

4    fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);

5    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material facts are those that may

6    affect the case's outcome.  *Anderson*, 477 U.S. at 248.  A dispute about a material fact is genuine if

7    there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *Id.* at

8    248-49.

9        The party moving for summary judgment has the initial burden of informing the court of the

10   basis for the motion and identifying those portions of the pleadings, depositions, answers to

11   interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material

12   fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To meet its burden, "the moving party

13   must either produce evidence negating an essential element of the nonmoving party's claim or

14   defense or show that the nonmoving party does not have enough evidence of an essential element to

15   carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

16   *Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076

17   (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need

18   only point out 'that there is an absence of evidence to support the nonmoving party's case.'")

19   (quoting *Celotex*, 477 U.S. at 325).

20       If the moving party meets its initial burden, the burden shifts to the non-moving party, which

21   must go beyond the pleadings and submit admissible evidence supporting its claims or defenses and

22   showing a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Nissan Fire*,

23   210 F.3d at 1103; *Devereaux*, 263 F.3d at 1076.  If the non-moving party does not produce evidence

24   to show a genuine issue of material fact, the moving party is entitled to summary judgment.  *See*

25   *Celotex*, 477 U.S. at 323.  In ruling on a motion for summary judgment, inferences drawn from the

26   underlying facts are viewed in the light most favorable to the non-moving party.  *Matsushita Elec.*

27   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

28

UNITED STATES DISTRICT COURT
For the Northern District of California

**B.  Expert Testimony and Plaintiffs' Objections**

Plaintiffs object to Defendants' expert declaration.  At summary judgment, an expert declaration must meet two tests: (1) the opinion expressed must be admissible under Federal Rules of Evidence 702 and 703, and (2) the declaration must contain "facts that would be admissible in evidence" and "show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  As to (2), an "[e]xpert opinion is admissible and may defeat summary judgment if it appears the affiant is competent to give an expert opinion and the factual basis for the opinion is stated in the affidavit, even though the underlying factual details and reasoning upon which the opinion is based is not."  *Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1008 (9th Cir. 2007).

Plaintiffs objects to the expert declaration on several grounds.

*1.  The Sufficiency of the Expert Disclosures Generally*

Plaintiffs argue that Defendants did not disclose the formal report required by Rule 26(a)(2), and in any event, the declaration and attached CV do not list the cases where Dr. Nipomnick testified in the last four years.  Supplemental Opposition, ECF No. 53 at 1.  Defendants point out that the declaration contains the same information as the Rule 26 report, Rule 26(a)(2)'s disclosures are geared toward trial (and Plaintiffs cite no authority to the contrary), and the only issue is the list of cases where Dr. Nipomnick gave sworn testimony.  Reply, ECF No. 55 at 8.  Defendants (a) made a Rule 26(a)(2) disclosure that they retained him as a trial expert, (b) identified his declaration as a statement of his opinions, the facts considered by him in relying on his opinions, any exhibits that would be used to summarize or support his opinions, and his qualifications, (c) offered his deposition, and (d) said that they would provide a "list of any other cases in which Dr. Nipomnick gave sworn testimony in the last our years . . . if plaintiffs seek to depose him."  *See id.*; Defendant's Expert Witness Disclosure on the EMTALA Issue, ECF No. 53-1 at 1-2.  Plaintiffs declined to depose him.  *See* Supplemental Opposition, ECF No. 53 at 2 (acknowledging that Defendants offered a deposition, arguing that Defendants were obliged to disclose the list, and asserting that their decision to depose the doctor "would have been determined by the 'other cases' disclosure.").

Rule 26(a)(2) requires the disclosure of  trial experts and reports with their (i) opinions, (ii) the facts and data considered in forming them, (iii) exhibits used to summarize or support them, (iv) the

UNITED STATES DISTRICT COURT
For the Northern District of California

witness's qualifications including all publications authored in the past 10 years, (v) a list of all cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the expert's study and testimony. *See* Fed. R. Civ. P. 26(a)(2). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence *on a motion, at a hearing,* or at trial, unless the failure was substantial justified or is harmless." Fed. R. Civ. P. 37(c)(1) (emphasis added).  Generally a failure to comply with expert disclosure requirements precludes introduction at trial, but courts have applied it to motions hearings. *See Tokai Corp. v. Easton Enterps.*, 632 F.3d 1358, 1365 (Fed. Cir. 2011) (summary judgment).  The decision to exclude evidence at summary judgment is reviewed in the Ninth Circuit for abuse of discretion. *Id.* (citing *Wong v. Regents of Univ. of Cal.*, 410 F.3d 102, 1060 (9th Cir. 2005)).  The trial court also has wide latitude to issue sanctions under Section 37(c)(1). *Id.* (citing *Yeti By Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).

Plaintiffs' arguments do not compel the court to disregard the expert declaration.  Rule 26(a) generally pegs disclosure of the formal report to the trial date.  As Defendants point out, the information required by Rule 26(a)(2)(B) is in Dr. Nipomnick's declaration and attached curriculum vitae.  The declaration gives the factual support for the expert's opinions required by Rule 703 in that the expert's declaration includes the facts Dr. Nipomnick considered, and those facts are those in the parties' joint statement of undisputed facts and the medical records that have been submitted in support of the summary judgment motion.  The declaration also satisfies Rule 56(c)(4).  The curriculum vitae also lists Dr. Nipomnick's prior expert work regarding EMTALA and the standard of care, including his contract work with CMS and the California Department of Health Services from 1999 to the present, his work with the Medical Board of California performing expert medical review in emergency medicine from 1996 to the present, and his other relevant expert work. *See* ECF No. 33-6 at 21.

Thus, the Rule 26(a)(2)(B) omission is only the list of cases where Dr. Nipomnick testified in the last four years.  This is not a sufficient ground to disregard the expert testimony in the declaration in support of the summary judgment motion.  As the "Procedural History" section demonstrates, the

**UNITED STATES DISTRICT COURT**
For the Northern District of California

court continued the summary judgment motion to give Plaintiffs the opportunity to develop all evidence (fact or expert) relevant to the EMTALA claim. Defendants offered Dr. Nipomnick's deposition, the court postponed the summary judgment hearing (and briefing) precisely to allow a full development of the EMTALA record, and the court specifically warned Plaintiffs in its November 2013 orders and the December 2013 case management conference that they needed to develop the record to withstand summary judgment. Plaintiffs nonetheless chose not to depose the expert. Plaintiffs argue conclusorily that "[w]hether the plaintiff may have wished to depose the witness would have been determined by the 'other cases' disclosure." Supplemental Opposition, ECF No. 53 at 2. They do not explain why that is so. The court also has a joint letter brief process to address any disputes such as disclosure of any prior testimony. *See* Standing Order, ECF No. 2-1. Any motion to compel discovery had to be brought within seven days after the close of discovery, *see* N.D. Cal. Civil. L. R. 37-3, and Plaintiffs brought no such motion. The record – the court's orders, the parties' stipulations about expert discovery, and the discussion at the case management conferences (particularly on December 12, 2013) – suggests that costs drove Plaintiffs' decision not to depose the expert. *See* Supplemental Opposition, ECF No. 53 at 1-2 (deposition cost was $600).[4]

In sum, given the apparent lack of importance of the list of prior testimony, Plaintiffs' failure to articulate prejudice or harm, Plaintiffs' ability to get the information (either by deposition or with the court's assistance), and the court's repeated emphasis to Plaintiffs about the impact of expert testimony and the need to develop the EMTALA record (fact and expert) before summary judgment, the court finds that there is no harm or prejudice on this record from the mere failure to disclose the list. The court also gave Plaintiffs an opportunity to engage an EMTALA expert (and a deadline to disclose one), they chose not to, and they are not arguing now that they want that opportunity.

To the extent that there are issues with any particular opinion that the court relies on, the court addresses those issues in the next section.

---

[4] In fairness, at the February 20, 2014 hearing, Plaintiffs' counsel argued that the records were sufficient to preclude summary judgment.

1

### 2. *Plaintiffs' Objections To Opinions*

2      The following quote from Plaintiffs' supplemental opposition contains Plaintiffs' other objections to

3   the court's consideration of Dr. Nipomnick's opinions:

4      a.   Although he says that the HELLP syndrome is a life threatening obstetric complication, he
            does not certify that he is familiar with the treatment of HELLP syndrome and whether it
5           requires admission to an ICU.

6      b.   He does not certify that the physicians at the defendants' hospital were qualified to attempt to
            stabilize the HELLP syndrome and in particular, offers no opinion that the resident in
7           training, Dr. Carey, had this skill.

8      c.   His statement that "From all indications, CCRMC had both the capability and capacity to
            render care to Ms. Lopez" is not an opinion based on any fact to which he refers.  In
9           addition, his statement is irrelevant.  EMTALA requires a "good faith" admission in order to
            stabilize the HELLP syndrome.  His opinion that "From all indications there was capability
10          and capacity to render care does not meet the EMTALA requirement. [Dec. 25, 4-5].

11     d.   His opinion about admission time is irrelevant as expert witness testimony is limited to a
            subject about which lay jurors are not capable of rendering an opinion.  Evidence Code
12          Section 702. The jurors are capable of determining that since a physician order is needed for
            inpatient hospital admission and an order does not exist for an 11:19 admission, that an
13          admission did not occur at that time.  Furthermore, without any evidence of a physician
            admit order at 11: 19, there simply is not a factual basis for the opinion.
14
15     e.    He does not explain why there was an admission at 1:03 if there was an admission at 11:19.

16   Opposition, ECF No. 34 at 7-8.

17      At the hearing, Plaintiffs agreed that much of Dr. Nipomnick's expert testimony was helpful.

18   For example, Plaintiffs rely on Dr. Nipomnick's declaration in support of the conclusion that Mrs.

19   Lopez's "diagnostic tests performed at the time she presented to the hospital disclosed preeclampsia

20   and HELLP syndrome which means that long before the 1:03 a.m. admission, the defendants

21   determined that Mrs. Lopez had an EMTALA emergency medical condition known as HELLP."

22   Supplemental Opposition, ECF No. 53 at 4.  As discussed at the hearing, Dr. Nipomnick's

23   declaration is a useful description of the diagnostic tests that Mrs. Lopez received and her treatment:

24      Mrs. Lopez's diagnostic tests performed at the time she presented to the hospital and thereafter
        disclosed preeclampsia and HELLP syndrome.  Preeclampsia is a medical condition
25      characterized by high blood pressure and significant amounts of protein in the urine of pregnant
        women.  If left untreated, it can develop into eclampsia, the life threatening occurrence of
26      seizures during pregnancy.  HELLP syndrome is also a life threatening obstetric complication
        usually considered to be a variant or complication of preeclampsia.  "HELLP" stands for the
27      three main features of the condition: hemolysis (the rupturing of red blood cells); elevated liver
        enzymes; and low platelet count."
28

1

2

3

4

5

> [Mrs. Lopez] was treated with laboratory tests to identify these conditions, specifically, PIH panels (CBC, LFTs, Uric Acid, PUN, Creatinine), urinalysis, and 24 hour urine protein. During labor and post-natally, she was treated with medications to address these conditions: Hydralazine, an anti-hypertensive, and Magnesium Sulfate, for seizure prophylaxis. The patient was also treated with repeat blood pressure checks. These blood pressure checks disclosed that the patient's high blood pressure decreased with the delivery of the child, as would be expected. She was stabilized for a short period of time. Thereafter, she had a manifestation of eclampsia, with an increase in her blood pressure. The patient sustained a cerebral bleed and eventually died.

6   Nipomnick Decl., ECF No. 33 at 26-27. Plaintiffs agreed at the hearing that these opinions were

7   helpful, particularly given that Defendants objected to Plaintiffs' attaching a medical record to its

8   opposition that Plaintiffs characterized (without their own expert) as showing the three indicators of

9   HELLP. *See* Supplemental Opposition, ECF No. 3 at 5; *id.* Ex. 6 (shows HELLP syndrome

10  indicators). Dr. Nipomnick's opinion allows the court to consider the exhibit.

11       Turning to the specific objections, as to objection a, the first clause is undisputed. As to his

12  familiarity with HELLP, Dr. Nipomnick's qualifications, his summary of the exhibits (which the

13  parties apparently used for the JSUF), and his descriptions of HELLP syndrome and the treatment

14  satisfy Rules 702 and 703 and Rule 56(c)(4). Plaintiffs conceded as much by their citation to this

15  opinion evidence (and did not dispute the utility of the evidence to their case at the hearing).

16       As to Dr. Nipomnick's failure to discuss whether HELLP requires admission to the ICU,

17  whether the staff was qualified, and whether the CCRMC had the capacity to treat (objections a

18  through c), as discussed below, that is Plaintiffs' theory of the EMTALA claim. *See* Opposition,

19  ECF No. 34 at 2 (HELLP requires ICU admission, and a hospital that knowingly admits a patient

20  with HELLP syndrome without the staff and facilities to address the syndrome does not act in good

21  faith). It is not Defendants' theory, which is that Mrs. Lopez's admission cuts off EMTALA

22  liability. *See* MSJ, ECF No. 33 at 5. To the extent that Plaintiffs' objection really is argument about

23  what EMTALA requires, the court considers that argument in the Analysis section. It is not a basis

24  for disregarding Dr. Nipomnick's opinions set forth in the Statement.

25       As to objection d, Dr. Nipomnick is an emergency-room physician with the qualifications and

26  expertise to opine on the issue of admission. The court disagrees that it is not the proper subject for

27  expert testimony. As to e, and as discussed below, it is Plaintiffs' theory that admission happened at

28  1:03 a.m. on September 30, not at 11:19 p.m. on September 29. The Defendants and Dr. Nipomnick

UNITED STATES DISTRICT COURT
For the Northern District of California

1   reach the opposite conclusion:  admission was at 11:19 p.m.  Plaintiffs' disagreement with that

2   conclusion is argument and not a sufficient ground to exclude the opinion.

3       In sum, Dr. Nipomnick's opinions are fair expert opinions.  Plaintiffs could have challenged the

4   factual predicates for them in fact discovery and developed the expert record by deposing Dr.

5   Nipomnick or retaining their own expert.  They did not.

6   **B.  EMTALA**

7       Congress passed EMTALA, also known as the "Patient Anti-Dumping Act," to prohibit hospital

8   emergency rooms from refusing to treat indigent and uninsured patients or transferring patients to

9   other hospitals without first stabilizing their condition.  *See Jackson v. E. Bay Hosp.*, 246 F.3d 1248,

10  1254 (9th Cir. 2001).  When a individual requests treatment from the emergency department of a

11  hospital that participates in the Medicare program, EMTALA requires the hospital to "provide for an

12  appropriate medical screening examination within the capability of the hospital's emergency

13  department, including available ancillary services routinely available to the emergency department,

14  to determine whether or not an emergency medical condition [as defined in the statute] exists."  42

15  U.S.C. § 1395dd(a).

16      An "emergency medical condition" is defined in section 1395dd(e)(1) as follows:

17  (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including
    severe pain) such that the absence of immediate medical attention could reasonably be expected
18  to result in –

19      (i) placing the health of the individual (or, with respect to a pregnant woman, the health of
        the woman or her unborn child) in serious jeopardy,
20
        (ii) serious impairment to bodily functions, or
21
        (iii) serious dysfunction of any bodily organ or part; or
22
    (B) with respect to a pregnant woman who is having contractions–
23
        (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or
24
        (ii) that the transfer may pose a threat to the health or safety of the woman or unborn child.
25
    If the hospital determines that the individual has an emergency medical condition, the hospital
26
    must "provide either –
27
    (A) within the staff and facilities available at the hospital, for such further medical examination
28  and such treatment as may be required to stabilize the medical condition, or

(B) for transfer[5] of the individual patient to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(b)(1). "The term 'to stabilize' means, with respect to an emergency medical condition described in paragraph [1395dd(e)](1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of an individual from a facility, or, with respect to an emergency medical condition described in paragraph [1395dd(e)](1)(B), to deliver, including the placenta." *Id.* § 1395dd(e)(3)(A).

Subsection (c) is titled "Restricting transfers until individual is stabilized," and it sets forth the conditions that must be met before a hospital may transfer an unstabilized patient:

(1) Rule

If an individual at a hospital has an emergency medical condition which has not been stabilized[6] (within the meaning of subsection (e)(3)(b) of this section), the hospital may not transfer the individual unless –

    (A)(i) the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility;

    (ii) a physician . . . has signed a certification that based on the information available at the time of the transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual, and in the case of labor, to the unborn child from effecting the transfer;[7] or

    (iii) if a physician is not present in the emergency department at the time the individual is transferred, a qualified medical person . . . . has signed a certification [as described in section ii] . . . after a physician . . . , in consultation with the [qualified medical] person, has made the determination [described in section ii] . . . and subsequently countersigns the certification; and

    (B) the transfer is an appropriate transfer . . . .

---

[5] EMTALA defines "transfer" as "the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by . . . the hospital . . . ." 42 U.S.C. § 1395dd(e)(4). The definition of "transfer" in 42 C.F.R. § 489.24(b) tracks the statute.

[6] The term "stabilized" is consistent "to stabilize," meaning, no material deterioration of the medical emergency is likely to occur during transfer. *See* 42 U.S.C. §§ 1395dd(e)(3)(A) & (B).

[7] The certification must include a summary of the risks and benefits upon which the certification is based. 42 U.S.C. § 1395dd(c)(1)(B).

42 U.S.C. § 1395dd(c)(1).  An "appropriate transfer to a medical facility is a transfer –

(A) in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

(B) in which the receiving facility –

(i) has available space and qualified personnel for the treatment of the individual; and

(ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment;

(c) in which the transferring hospital sends to the receiving hospital all medical records . . . relating to the emergency condition [including records of the medical condition, observations of signs or symptoms, diagnosis, and test results] . . . and the informed written consent . . . ;

(D) in which the transfer is effected through qualified personnel and transportation equipment [including the use of life support measures during the transfer] . . . ; and

(E) which meets other such requirements as the Secretary may find necessary in the health and safety of individuals transferred.

42 U.S.C. § 1395dd(c)(2).

In 2003, the Centers for Medicare & Medicaid Services of the Department of Health and Human Services promulgated regulations interpreting key EMTALA provisions.  *See* 42 C.F.R. § 489.24 (2009).[8] (the "CMS Regulations").  42 C.F.R. § 489.24(a) provides that EMTALA does not apply to patients who have been admitted for treatment:

(1) [I]f an individual . . . "comes to an emergency department"[9], as defined in paragraph

_____

[8]  The court relies on the 2009 version of the regulations, which was effective in September 2011.  CMS amended the regulations on July 16, 2012 and again on October 1, 2013.

[9]  "Comes to the emergency department" is defined in section 489.24(b), which states that it "means, with respect to an individual who is not a patient (as defined in this section), the individual" has presented at the emergency department and requests treatment for a medical condition, has presented on hospital property and requests treatment for what may be an emergency medical treatment, or is in an ambulance for purposes of treatment in the hospital's emergency department (under certain conditions).  42 C.F.R. § 489.24(b) (emphasis added).  "Emergency department" is defined as any department or facility that (a) is licensed as an emergency department, (b) is held out to the public as a place that provides care for emergency medical conditions on an urgent basis without a prior appointment, or (c) in the previous calendar year provided at least one-third of all its outpatient visits for the treatment of emergency medical conditions on an urgent basis without a prior appointment.  *Id.*  "Patient" is defined as a person who has begun to receive outside patient

[489.24](b) of this section, the hospital must –

(i) Provide an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition exists. The examination must be conducted by an individual(s) . . . qualified under hospital bylaws or rules and regulations and [under 42 C.F.R. § 482.55]; . . . and

(ii) If an emergency medical condition is determined to exist, provide any necessary stabilizing treatment, as defined in paragraph (d) of this section, or an appropriate transfer as defined in paragraph (e) of this section. **If the hospital admits the individual as an inpatient for further treatment, the hospital's obligation under this section ends, as specified in paragraph (d)(2) of this section.**

42 C.F.R. § 489.24(a) (emphasis added). Section 489.24(d) reiterates:

(d) Necessary stabilizing treatment for emergency medical conditions –

(1) General. Subject to the provisions of paragraph (d)(2) of this section, if any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either –

(i) Within the capabilities of the staff and facilities available at the hospital, for further medical examination and treatment as required to stabilize[10] the medical condition.

(ii) For transfer of the individual to another medical facility in accordance with paragraph (e) of this section.

(2) Exception: Application to inpatients.

(i) If a hospital has screened an individual under paragraph (a) of this section and found the individual to have an emergency medical condition, **and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition**, the hospital has satisfied its special responsibilities under this section with respect to that individual.

42 C.F.R. § 489.24(d) (emphasis added). The CMS Regulations also define the term "inpatient:"

Inpatient means an individual who is admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services as described in § 409.10(a) of this chapter with the expectation that he or she will remain at least overnight and occupy a bed even though the situation later develops that the individual can be discharged or transferred to another hospital and does not actually use a hospital bed overnight.

42 C.F.R. § 489.24(b). Section 409.10(a) defines "inpatient hospital services" as a series of

---

services (under certain circumstances) or an individual who has been admitted as an inpatient. *Id.*

[10] 42 C.F.R. § 489.24(b)'s definition of "to stabilize" is the same as the definition in 42 U.S.C. § 1395dd(e)(e)(A), meaning, to provide such treatment to assure that no material deterioration is likely to result from or occur during transfer. *See supra* n.6.

services:

(1) Bed and board.

(2) Nursing services and other related services.

(3) Use of hospital and CAH [Critical Access Hospital] facilities.

(4) Medical social services.

(5) Drugs, biologicals, supplies, appliances, and equipment.

(6) Certain other diagnostic or therapeutic services.

(7) Medical or surgical services provided by certain interns or residents-in-training.

(8) Transportation services, including transport by ambulance.

42 C.F.R. § 409.10(a).[11]

Plaintiffs' theory of EMTALA liability is that EMTALA requires treatment to stabilize (or stabilize to transfer), and under 42 C.F.R. § 489.24(d)(2), the admission to stabilize must be in good faith.  As the court held previously, this is a plausible theory under EMTALA and the court's intent was to address at summary judgment whether the hospital admitted Mrs. Lopez under EMTALA to stabilize her, and whether as an issue of fact the admission was not in good faith because the hospital did not have the ability to stabilize her.  Order, ECF No. 26 at 9.  In this context, when EMTALA applies, it imposes the following obligations on a hospital.

First, when an individual "comes to a hospital emergency department," which includes a labor and delivery department, the hospital must provide an appropriate medical screening exam.

Second, if the hospital detects an emergency medical condition and does not admit the individual, then it must either provide treatment as may be required to "stabilize" the medical condition or "transfer" the individual elsewhere (transfers are subject to additional regulations and patient protections).

Third, if the hospital admits the individual as an inpatient in good faith in order to stabilize the emergency medical condition, then the hospital has satisfied its EMTALA responsibilities.  Again,

_____

[11]  42 C.F.R. § 409.10(b) excludes services that are not relevant here from the definition of inpatient hospital services.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    "to stabilize" means to provide such treatment to assure that no material deterioration is likely to

2    result from or occur during transfer.  *See* 42 U.S.C. § 1395dd(e)(e)(A); 42 C.F.R. § 489.24(b).

3        As the court stated previously, if the hospital admitted Mrs. Lopez for treatment, then there is no

4    liability under  EMTALA, and the complaint states a state medical malpractice claim.  Order, ECF

5    No. 2 at 10; *see Harry v. Marchant*, 291 F.3d 767, 771 (11th Cir. 2012); *Bryant v. Adventist Health*

6    *Systems/West*, 289 F.3d 1162, 1169 (9th Cir. 2002).  But if the hospital admitted her to stabilize her

7    (within the statute's meaning of "to stabilize," meaning, to provide such treatment to assure that no

8    material deterioration is likely to result from or occur during transfer) and did not have the facilities

9    to do so, then there could be a fact issue about the hospital's good faith in doing so.  *See* Order, ECF

10   No. 26 at 10.

11       More specifically, the good-faith language in 42 C.F.R. § 489.24(d)(2)(i) provides a narrow

12   exception to the general rule that inpatient admission cuts off EMTALA liability.  As the Ninth

13   Circuit explained:

14       [A] hospital cannot escape liability under EMTALA by ostensibly "admitting" a patient, with
         no intention of treating the patient, and then discharging or transferring the patient without
15       having met the stabilization requirement.  In general, however, a hospital admits a patient to
         provide inpatient care.  We will not assume that hospitals use the admission process as a
16       subterfuge to circumvent the stabilization requirement of EMTALA.  If a patient
         demonstrates in a particular case that inpatient admission was a ruse to avoid EMTLA's
17       requirements, then liability under EMTALA may attach.

18   *Bryant v. Adventist Health System/West*, 289 F.3d 1162, 1169 (9th Cir. 2002).

19       *Bryant* predates the CMS Regulations that established the "good faith" requirement, but the

20   analysis is the same.  If an individual comes to a hospital emergency department, and the hospital

21   detects an emergency medical condition, admits the patient as an inpatient in order to treat that

22   condition, and provides treatment, the hospital cannot be liable under EMTALA, even if that

23   treatment is below the standard of care.  By contrast, if the hospital admits to stabilize (meaning, to

24   provide such treatment to assure that no material deterioration is likely to result from or occur during

25   transfer), and that admission is not in good faith (and an example might be a ruse), then liability

26

27

28

1    under EMTALA may attach.[12]

2         Plaintiffs nonetheless appear to argue that an admission does not cut off EMTALA liability

3    unless it is in good faith.  *See* Opposition, ECF No. 34 at 2:24-26.  When asked, counsel reiterated

4    that position at the February 20, 2014 hearing.  If Plaintiffs are arguing this, then it is not supported

5    by the statute, which imposes a good-faith requirement only on admissions to stabilize for transfer.

6    **II. THE EMTALA CLAIM**

7         The first issue is whether and when Mrs. Lopez was admitted to the hospital.  The undisputed

8    record supports the conclusion that she was admitted when she arrived in labor.  The "Labor

9    Progress Report" has the following information.  First, it has the admit nurse's notation of "pt. direct

10   admit for labor," *see* JSUF #3 & Ex. A-10, ECF No. 33-1 at 10.  Second, the label at the top has

11   Mrs. Lopez's name, identifying information, and the notations "Admit Date: Admit Date: 09/29/11"

12   and "INPT."  *See id.*  This label is repeated on Mrs. Lopez's medical records.  *See* Exs. A-1 to A-91.

13   *Id.*  Mrs. Lopez's "Patient Registration Face Sheet" indicates that her "ADMIT DATE" was

14   "9/29/11" and her "ADMIT TIME" was "23:19."  Ex. A-1.  Ms. Jones, the nurse and medical center

15   supervisor working the 4:00 p.m. to midnight shift on September 29, 2011, testified that this meant

16   that Mrs. Lopez was admitted on September 29, 2011, at 11:19 p.m.  Jones Depo., ECF No. 55-1 at

17   9:8-24.  Dr. Nipomnick, the emergency room physician hired as an expert, confirms that [t]he

18   records reflect that Sandra Lopez was admitted to Contra Costa Regional Medical Center on

19   September 29, 2011 at approximately 11:00 p.m. for completion and subsequent delivery with

20   related care."  Nipomnick Decl., ECF No. 33 at 26.[13]

21

22        [12]  As the court said previously, there is a tension between 42 C.F.R. § 489.24(a)(1)(i)'s
23   absolute cut-off of EMTALA liability at admission and 42 C.F.R. § 489.24(d)(2)(i)'s cut-off of
     EMTALA liability for a good-faith admission to stabilize.  Given section 489.24(a)(1)(i)'s explicit
24   cross-reference to section 489.24(d)(2)(i), the court did not resolve the issue at the pleadings stage,
     instead electing to wait until summary judgment.  The idea was to decide the issue in the context of
25   the facts, and the court's order was only that as pled, the complaint plausibly stated a claim.  *See*
26   Order, ECF No. 26 at 10-11 & n.11.

27        [13]  Plaintiffs did not object to this part of the opinion.  Given their general challenge to the
     sufficiency of the expert disclosure under Rule 26(a)(2), the court nonetheless notes that its result
28   would be the same even without Dr. Nipomnick's declaration.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    The second issue is whether Mrs. Lopez received treatment.  The records summarized at length

2  in the Statement and Dr. Nipomnick's declaration establish that she received treatment for delivery

3  and her preclampsia and HELLP syndrome.  She had laboratory tests to identify the conditions,

4  medications to address them (including an anti-hypertensive and medication for seizure

5  prophylaxis), and repeated blood pressure checks to monitor them (revealing decreasing blood

6  pressure).  *See supra* Statement; Nipomnick Decl., ECF No. 33 at 19-28.

7    In sum, the evidence establishes that Mrs. Lopez was admitted as an inpatient and treated for the

8  emergency medical conditions identified.  As a result, the CCRMC does not have liability under

9  EMTALA.  Plaintiffs' arguments do not change this conclusion.

10    Plaintiffs argue that the hospital did not admit Mrs. Lopez at 11:19 p.m. because labor and child

11  delivery are emergency-room procedures, and the admission here is the admission to the post-partum

12  floor after delivery, at 2:30 a.m.  Opposition, ECF No. 34 at 2; *see* JSUF #30; Exs. A-63, A-70.

13  Another possibility for the admission time is 1:03 a.m., when Dr. Carey admitted Mrs. Lopez via the

14  form titled "Labor & Delivery Pre-Eclampsia Admit Orders."  *See* JSUF #27; Ex. A-19.  That fits in

15  with the timeline of birth at 11:45 p.m., Mrs. Lopez's remaining in Labor and Delivery, and then

16  Mrs. Lopez's subsequent transfer at 2:30 a.m. to the post-partum floor.  Opposition, ECF No. 34 at

17  5.  But Ms. Jones, the medical center supervisor, and Dr. Nipomnick disagree with that timeline.

18  And the medical records throughout the course of treatment bear the stamp showing Mrs. Lopez's

19  admission as an inpatient at 11:19 p.m. on September 29, 2011.

20    Plaintiffs also argue that only a doctor can admit a patient, and thus the earliest possible

21  admission time is the 1:03 notation by Dr. Carey on the "Labor & Delivery Pre-Eclampsia Admit

22  Orders."  Opposition, ECF No. 34 at 3-7; Supplemental Opposition, ECF No. 53 at 2-5.  But Ms.

23  Jones explained that each unit has its own protocol for admitting patients, the OB does a "direct

24  admit," and nurses admit patients under the guidance of physicians.  *See* Jones Depo., ECF No. 53-1

25  at 1:13, 4:17-5:7; ECF No. 55-1 at 9:8-10:13.  Ms. Jones testified specifically that doctors do not

26  have to write the admit orders.  ECF No. 55-1 at 10:10-12.  Also, the doctors' orders at Exhibits A-

27  19, A-63 and A-70 each bear the stamp noting the admission of Mrs. Lopez on September 29, 2011

28  as an in-patient.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    In further support of the argument that only a doctor can admit a patient, Plaintiffs point to

2    Defendants' failure to submit a declaration from Dr. Carey about why he prepared the "Labor &

3    Delivery Pre-Eclampsia Admit Orders" at 1:03 a.m. on September 30, 2011.  Supplemental

4    Opposition, ECF No. 53 at 3.  Defendants respond that Plaintiffs noticed Dr. Carey's Deposition for

5    December 19, 2013, rescheduled it for January 13, 2014, and then took it off calendar.

6    Supplemental Reply, ECF No. 55 at 4 (citing Notice of Deposition, ECF No. 55-1 at 12-13).

7    Plaintiffs acknowledged at the hearing that they cancelled the deposition.  Ms. Jones also testified

8    directly that no written doctor's order was required.  Jones Depo., ECF No. 55-1 at 10:10-12.

9    Plaintiffs also argue that the transfer to the post-partum floor was not in good faith to stabilize

10   Mrs. Lopez's emergency medical condition.  Opposition, ECF No. 34 at 2.  This argument is

11   predicated on the argument that delivery was an emergency-room procedure and that the admission

12   as an inpatient necessarily happened only post-delivery with the transfer to the post-partum floor.

13   (The court assumes the predicate for purposes of this section.)  Plaintiffs argue that when

14   Defendants admitted Mrs. Lopez to the post-partum floor, they knew that they did not have the staff

15   and facility to stabilize her emergency medical condition.  Opposition, ECF No. 34 at 2.  By this

16   time, again, the hospital knew that it could not stabilize Mrs. Lopez, and the argument thus is that

17   the admission was not in good faith to stabilize and thus violates EMTALA.  *Id.* at 5-6.

18   In support of their argument about lack of good faith, Plaintiffs point to Dr. Helgerson's October

19   17 discharge summary.  JSUF #53; *see* Ex. A-86.  Dr. Helgerson was not involved in Mrs. Lopez's

20   postpartum care but she records that "it was her understanding that [Mrs. Lopez]'s lab[ resul]ts on

21   September 30, 2011, including her platelets and liver function tests (LFs) were significantly worse

22   than [her lab results] on September 29, and the decision was made to transfer the patient to Intensive

23   Care.  There were no beds available in the ICU in the morning of September 30, 2011, so she

24   remained on postpartum until around noon or 1:00 p.m. on September 30, 2011, at which time she

25   was noticed to be having seizure-like activity.  The nurses and Dr. McIlroy who met them in the

26   hallway brought her down to the ICU."  JSUF #53.

27   Defendants respond that Dr. Helgerson was not a percipient witness and that Ms. Jones's

28   testimony about hospital records shows that ICU had bed space.  *See* Reply, ECF 55 at 6.  That

UNITED STATES DISTRICT COURT
For the Northern District of California

1   testimony is summarized in the Statement and establishes that the censuses for the relevant shifts on

2   September 29 and September 30, 2011 show bed space available.  That being said, the testimony

3   was that a census does not show an hour-by-hour summary.  *See* Statement, *supra*.  Still, over the

4   course of treatment, the records show that bed space was available at different times (although they

5   do not illuminate whether the ICU was staffed sufficiently to accommodate care for patients who

6   might fill the empty beds).  In the end, the availability of ICU bed space does not affect the outcome

7   given the course of treatment established in the medical records.  Post-delivery, they show declining

8   blood pressure, Dr. Carey's note at 3:35 a.m. that "Mom and baby are currently stable," the

9   continued treatment and monitoring of Mrs. Lopez, the reporting of her test results, her evaluation

10  on September 30, 2011 at 9:10 a.m. (including notes referring to HELLP and a treatment plan that

11  included a transfer to the IMCU if needed), the decision to prepare her for transfer to the ICU at 11

12  a.m., and the decision at 12:30 p.m. to transfer her to the ICMU.  *See* JSUF #30-46 and Exs. A-63,

13  A-14, A-70.

14       Plaintiffs also argue that Defendants knew that HELLP with multi-organ dysfunction requires

15  admission to the ICU.  Supplemental Opposition, ECF No. 53 at 3.  They point to a chapter

16  published in a medical treatise in March 2012 that allegedly was written before September 2011 by

17  an attending obstetrician at CCRMC, Emily Newfield.  *See id.* at 3-4, 6-7 (citing and attaching E.

18  Newfield, "Third-Trimester Pregnancy Complications," MD Consult, Primary Care: Clinics in

19  Office Practice, Vol. 39, Issue 1 (March 2012)).  Dr. Newfield's article states the following:

20       Several conditions mimic severe preeclampsia/HELLP, including acute fatty liver of pregnancy,
         viral hepatitis, idiopathicthrombocytopenic purpura, thrombotic thrombocytopenic purpura,
21       (TTP), gallbladder disease, diabetes mellitus, pyelonephritis, and systemic lupus erythematosus.
         When patients present with multiorgan dysfunction, consultation with a perinatologist is very
22       helpful, and these patients often require admission to the intensive care unit and may necessitate
         large-volume transfusion or plasmapheresis; these problems are often best managed in a tertiary
23       care referral hospital."

24  Plaintiffs argue that Defendants' knowledge about this is relevant to their good faith in admitting

25  Mrs. Lopez to stabilize her.

26       This argument does not change the outcome either.  The medical records establish that Mrs.

27  Lopez was admitted, not that she was admitted in good faith to "stabilize" her, meaning to provide

28  such treatment to assure that no material deterioration is likely to result from or occur during transfer

UNITED STATES DISTRICT COURT
For the Northern District of California

1   for treatment.  *See* 42 U.S.C. § 1395dd(e)(e)(A)*;* 42 C.F.R. § 489.24(b).  After she was admitted, she

2   received treatment, including for her preeclampsia, eclampsia, and HELLP syndrome.  Dr. Newfield

3   was not a treating physician that day or a percipient witness.  Plaintiffs had the opportunity to

4   develop any evidence before EMTALA evidence closed (including by questioning fact witnesses or

5   engaging experts).  They did not.

6        Plaintiffs nonetheless argue that Defendants cut off their ability to question Dr. Newfield about

7   whether HELLP patients often require admission to the ICU.  *See id.* at 4.  Assuming relevance,[14]

8   Plaintiffs could have (and did not) file a motion to compel within seven days after close of

9   discovery, or they could have availed themselves of the court's discovery procedures, which allow

10  counsel to call the court during the deposition to resolve disputes.  *See* Standing Order, ECF No. 2-1.

11  And again, Plaintiffs had the ability to explore Defendants' knowledge and good faith through

12  discovery, and they did not.  Questioning Dr. Newfield further would not develop the record further

13  (given that the court considers the treatise in reaching this result).[15]

14       In sum, on this record, Plaintiffs' argument about whether "monitoring in the ICU was needed in

15  order to stabilize the HELLP syndrome," *see* Opposition, ECF No. 34 at 7, is a medical malpractice

16  claim, not an EMTALA claim.  As the Ninth Circuit explained, EMTALA does not establish a

17  federal cause of action for medical malpractice.  *See Bryant*, 289 F.3d at 1166.  "Congress enacted

18  EMTALA 'to create a new cause of action generally unavailable under state tort law, for what

19

20       [14]  The court assumes relevance, considers the treatise in the context of Plaintiffs' argument
    that the delivery was an emergency-room procedure and that CCRMC later admitted Mrs. Lopez to

21  stabilize her, considers its relevance to establish Defendants' lack of good faith, and concludes that
    it does not does not change the outcome.  Thus, the court overrules Defendants' objection to

22  consideration of the treatise.  *See* ECF No. 55-2 at 1-2.

23

24       [15]  Plaintiffs argued at the February 20, 2014 hearing that it is Defendants' burden at
    summary judgment to show good faith.  *Bryant* suggests that Plaintiffs bear the burden at trial: "We

25  will not assume that hospitals use the admission process as a subterfuge to circumvent the
    stabilization requirement of EMTALA.  If a patient demonstrates in a particular case that inpatient

26  admission was a ruse to avoid EMTLA's requirements, then liability under EMTALA may attach."
    289 F.3d at 1169.  Defendants point out the absence of evidence to support lack of good faith.  *See*

27  *Devereaux*, 263 F.3d at 1076.  Even if it were Defendants' burden at trial, they made a sufficient

28  showing.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   amounts to failure to treat' and not to 'duplicate preexisting legal protections.'" *Id.* at 1168-69

2   (quoting *Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991)).  At the

3   pleading stage, the allegation that the hospital admitted Mrs. Lopez to stabilize her without good

4   faith was sufficient to survive a motion to dismiss.  *See* Order, ECF No. 26.  At summary judgment,

5   the record has no material issues of fact in dispute regarding EMTALA liability.  The court grants

6   CCRMC's motion for summary judgment on the EMTALA claim.

7   **III. SUPPLEMENTAL JURISDICTION**

8       CCRMC asks the court to decline to exercise supplemental jurisdiction under 28 U.S.C.  §

9   1367(a) over the state medical malpractice claim.

10      A district court may decline to exercise supplemental jurisdiction over a related state-law claim

11  where "(1) the claim raises a novel or complex issue of state law, (2) the claim substantially

12  predominates over the claim or claims over which the district court has original jurisdiction, (3) the

13  district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional

14  circumstances, there are other compelling reasons for declining jurisdiction." *Id.* at § 1367(c).  The

15  court may also decline to exercise supplemental jurisdiction if the retention of the state claims

16  "requires the expenditure of substantial additional judicial time and effort." *Executive Software*

17  *North America, Inc. v. U.S. Dist. Court for Cent. Dist. of California*, 24 F.3d 1545, 1548 (9th Cir.

18  1994); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343 (1988); *see also Government Employees Ins.*

19  *Co. v. Dizol* 133 F.3d 1220, 1224 (9th Cir. 1998).  It can be an abuse of discretion to decline

20  jurisdiction when factors of judicial economy, convenience, and fairness to the parties militate in

21  favor of retaining jurisdiction.  *See Trustees of Constr. Indus. & Laborers Health & Welfare Trust v.*

22  *Desert Valley Landscape & Maintenance, Inc.*, 333 F.3d 923, 926 (9th Cir. 2003).

23      The remaining claim does not involve novel or complicated issues of state law, the court is very

24  familiar with the case, and a firm trial date has been set.  Interests of judicial economy, convenience,

25  and fairness to the parties militate in favor of the court's retaining jurisdiction.

26

27

28

1

**CONCLUSION**

2        The court grants summary judgment in favor of CCRMC on Mr. Lopez's EMTALA claim and

3    retains jurisdiction over the remaining state claim.  This disposes of ECF No. 33.

4        **IT IS SO ORDERED**.

5    Dated: February 28, 2014

6                                                                        _____
                                                                         LAUREL BEELER
                                                                         United States Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28